KROENUNG *et al.*, *Appellants*, v. GOEHRI *et al.*

### Division One, December 12, 1892.

1. **Deed:** FRAUD AND UNDUE INFLUENCE: EQUITY. Where the consideration of a deed is inadequate, and the grantor, an old man in ill health, was induced to execute it to the grantee, his tenant, by the latter's deception and threats, equity will set it aside as having been obtained by fraud and undue influence.

2. **Equity:** LACHES. A court of equity will often refuse relief because of delay in bringing the suit, though the period of such delay is less than that prescribed in the statute of limitations.

3. ———: ———. The foregoing rule applies where the relief is sought on the ground of fraud, but there can be no laches until the fraud is discovered or ought to have been discovered.

4. **Infants.** No laches, as a general rule, will be imputed to an infant during the continuance of his minority.

*Appeal from St. Louis County Circuit Court.*—HON. W. W. EDWARDS, Judge.

REVERSED AND REMANDED.

*A. McElhinney* for appellants.

(1) The court ought to have set aside the deed, upon the gross inadequacy of the consideration named therein, and the unconscionableness of the transaction. *Railroad v. Brown*, 43 Mo. 294; *Durfee v. Moran*, 57 Mo. 374; *Nelson v. Betts*, 21 Mo. App. 219; 1 Story's Equity Jurisprudence, sec. 246. Fraud may be presumed on account of the gross inadequacy of the consideration named. Kerr on Fraud & Mistake, pp. 186, 187; *Butler v. Haskell*, 4 Des. 651, and other cases referred to in Bump's notes. (2) The court erred in the written opinion, that laches can be imputed to the infant plaintiffs, during their minority,

and within the period of limitation. Littleton, secs. 402, 726; Chambers on Infancy, top p. 416; Tyler on Infancy [2 Ed.] top p. 167; *Small v. Dee*, 2 Salk. 416; *Stowell v. Zouch*, Plowden's Reports, 364; *Whaley v. Elliot*, 1 A. K. Marshall; *Ware v. Brush*, 1 McLean, C. C. 533; *State v. McKnight*, 1 Bay. 65; *Pugh v. Ball*, 1 J. J. Marshall, 399; *Gillespie v. Bailey*, 12 W. Va. 399; *Washington v. Huger*, 1 Des.; *McMillan v. Rushing*, 80 Ala. 406.

*R. H. Stevens* for respondents.

(1)  The consideration for the conveyance is the most valuable known to the law. *Cadwallader v. West*, 48 Mo. 499; *Jackson v. Wood*, 88 Mo. 76; *Callery v. Miller*, 1 N. Y. S. 88; *Rankin's Adm'rs v. Wallace*, 14 S. W. Rep. 79. (2) The appellants are barred by laches; after a silence for ten years, and after all the material witnesses for defendants are dead, a court of equity will grant no relief. *Burdett v. May*, 100 Mo. 15; *Lenox v. Harrison*, 88 Mo. 498; *McCartin v. Adm'r*, 11 A. (N. J.) 156; *Sebring's Adm'r v. Sebring's Adm'r*, 10 A. 193; *Sanchez v. Dow*, 2 So. 842; *Allen v. Colburn*, 17 Mo. App. 1090; *In re Gardner*, 41 N. W. Rep. (Mich.) 505; *Champion v. Woods*, 21 P. 534; *Sheffield Iron & Land Co. v. Neill*, 6 So. 1; *Johnson v. Standard Mining Co.*, 39 F. 304; *Lynch's Adm'r v. Venneman*, 18 A. (N. J.) 468.

BLACK, J.—Casper Kroenung died in the latter part of June or the first of July, 1880, leaving as his devisees and heirs at law two grandsons, the sons of a deceased son. These grandsons were minors at the time of the death of their grandfather, being then of the age of five and eight years respectively. They brought this suit by their guardian on the twenty-sixth

of February, 1890, to set aside a deed and bill of sale, both executed by their grandfather to John Goehri. The deed bears date the eleventh of May, 1880, and conveys one hundred and seventeen acres of land shown to have then been of the value of $2,000 or $3,000. It was made upon the following consideration as therein expressed: "That whereas the said John Goehri has and does hereby agree and covenant with the said Casper Kroenung to board, wash for and wait on the said Casper Kroenung, and perform such other duties as may be required by the said Kroenung during the natural life of said Casper Kroenung; in addition to which the said John Goehri agrees to pay to the two grandsons of the party of the first part, namely, Albert and Martin Joseph Kroenung, when the youngest of them becomes of legal age, the sum of $1,200." The bill of sale bears date the eighteenth of May, 1880, and by it the vendor sold to the vendee all of his farming implements, carpenter tools and household furniture, the title to vest in the vendee upon the death of the vendor, for the consideration of $160 to be paid to the two grandsons when the youngest should become of age.

It will be seen from the dates before mentioned that Casper Kroenung died in 1880, three or four weeks after the date of the deed. John Goehri, the vendee, continued in the possession of the land down to his death in 1889. He and his wife died about the same time, leaving several minor children, who with the administrator of the Goehri estate are made defendants in this suit. The grounds upon which the plaintiffs seek to set aside the deed and bill of sale are inadequacy of consideration, fraud and undue influence practiced by the vendee.

The evidence discloses the following facts: Casper Kroenung was seventy-five years of age at the date of

the transaction now in question, and had been a widower for several years, having no relative in his household. John Goehri had been his tenant for three or four years. Goehri and Kroenung resided in the same house, though the latter occupied a separate room and cooked for himself until three or four months before he died, during which time he boarded with Goehri. Kroenung executed a will in November, 1879, by which he devised and bequeathed his property, real and personal, to his two grandsons, the plaintiffs in this case. In the summer or fall of the same year, the exact date is not given, he took his deeds to a justice of the peace and requested the latter to prepare a deed conveying this land to Goehri upon substantially the same terms as those stated in the deed now in dispute. The justice advised him not to make the deed on such terms, and at the same time advised him to consult his brother and a nephew who resided some five or eight miles distant. These relatives also advised against the proposed transaction. Thus matters stood until the eleventh of May, 1880, at which time Goehri requested the same justice to go to the Kroenung residence and prepare a deed. The justice obeyed the request, and it was then the deed now in question was signed and delivered to Goehri. At that time Kroenung was confined to his bed, and was in a helpless condition from paralysis of the right side. He had been in this condition for one, two or three weeks, the exact date is not stated. The evidence shows that Goehri had been endeavoring to get a deed to the land for one or two years, but Kroenung had resisted all such efforts through the advice of friends. After Kroenung was stricken with paralysis, he requested Goehri to inform his, Kroenung's, brother and nephew, and have them come to his assistance. They did not come, and it is clear that he made the deed laboring under the false

impression that they had been informed of his helpless condition, and declined to aid him in his hour of distress.

All this is shown by the testimony of the justice of the peace and several neighbors. It also appears that Goehri did not see or even send word to this brother and nephew, who resided five and eight miles distant. The property described in the deed and bill of sale constituted the entire property of the vendor, except some notes of the face value of $2,100, but much less in real value.

William Kramer testified: "I saw Goehri down at the creek and asked him how the old man was getting along; he said he was in a bad condition, and added that he wished the old man would live a year or two longer so he could make a better trade. I asked him if he went to see the old man's brother and nephew to tell them how the old man was. He said he did not go; that he started and got as far as Hoppenburg's and went back; that he wanted to make a trade with the old man and that was a good time to do it; that he wanted to make a bargain with the old man and that was a good time to do it." It appears Kroenung fell from a chair on which he was sitting at the time he was stricken with paralysis, and that Goehri spoke of this incident in the conversation just recited. The witness being asked what Goehri said about it answered: "He said he told him if he did not get up and make a bargain with him he would let him lay there in his dirt and die." "Q. He said what?" "He said if he, meaning the old man, did not get up and make a bargain with him he would let him lay there and die in his dirt. I do not know that he particularly used the words 'get up.' I don't suppose the old man could get up, but he did say that he told him if he did not make a bargain then he would let him lay in his dirt and die."

This witness says Mr. Wardenburg was there, and heard the conversation. Wardenburg being called, testified: "I asked Goehri how it happened that he got the land so cheap. He said the old man was compelled to sell it to him. He said he told the old man if he did not sell it to him on his own terms he would leave him there to die in his own dirt. He said that when Kramer was present. He said the same thing at my house in the presence of my wife after the old man died." Speaking to another person of the transaction, Goehri said: "I got the old rascal."

Another witness says he met Goehri one day, and Goehri said Kroenung was worse; that the old man wanted him to go down to the bottoms and see his folks (brother and nephew) and tell them to come up and see him; that Goehri started but did not go.

It appears Kroenung held one, two or three notes executed by Goehri, certainly one for $300. There was an inventory made by the executor shortly after the death of Kroenung; Goehri was then questioned as to this note or notes, and he said the old man made him a present of them.

Other evidence is to the effect that Kroenung had tried to get one or two other persons to come and live with him, but they declined to do so; that he disliked the widow of his deceased son and her second husband; that he said his object in making the deed was to keep the property out of her hands and the hands of her then husband until the boys became of age. He transacted some little business during the last month of his life, but was unable to sign his own name as he had done before he was stricken with paralysis. That Goehri and his wife gave him due attention while he was confined to his bed, is not questioned.

There is no such inadequacy of consideration here as to justify any court in setting aside the deed on that

ground alone.   If the deed is set aside, it must be on the ground of fraud or undue influence, or both combined; but in disposing of these questions we may look to the consideration agreed to be paid, as well as the other attending circumstances.

This case depends to a considerable extent upon parol evidence, and that evidence consists partly of reported declarations and statements of Goehri made ten years before the trial.   Such evidence must be received with great caution.   The witnesses, whose testimony has been recited, were men of mature years, neighbors of both parties to the deed, and appear to be free from prejudice.   There is other evidence quite as favorable to the plaintiffs, but it comes from persons who were unfriendly to Goehri in his lifetime, and we have thought best to lay it out of view.

Looking to what we conceive to be reliable evidence, we can but conclude that Kroenung was in the hands of and wholly dependent upon Goehri.   If the latter desired to treat with Kroenung under these circumstances, it became his duty to make full disclosures. Instead of doing this, he, by false reports, induced the old man to believe that he had been forsaken by his brother and nephew.   To sum up, the case is this: Kroenung was advanced in years and a feeble man at best.   At the date of the deed he was confined to his bed and helpless from paralysis, and his mind was, to some extent, impaired.   He made the deed as a last resort to get assistance, believing he had been abandoned by his own brother.   This belief was the result of a studied deception—a fraud practiced by Goehri for the very purpose of obtaining the deed, and there is evidence to the effect that to this deception Goehri added threats.   Besides this the transaction was an unfair one in its terms.   We say this because Goehri agreed to pay in money only one-half of the value of the land,

and that at the expiration of fifteen years without interest. In short he got the use of the farm for fifteen years and at least $1,000 for his agreement to take care of the vendor during the remainder of his days. It must have been evident that Kroenung could not live to exceed one or two years. The alleged fraud in procuring the deed is established, and the deed should be set aside unless the lapse of time constitutes a bar.

The deed was executed, as has been said, on the eleventh of May, 1880, and this suit was commenced on the twenty-sixth of February, 1890. It is not contended that the cause of action is barred by the statute of limitations, but it is insisted that the cause of action is a stale one, and for that reason the relief asked should be refused.

A court of equity will refuse relief where the party has slept upon his rights for an unreasonable length of time, and this too without regard to the statute of limitations. In other words a court of equity will often refuse relief, because of delay in bringing the suit, though the period of delay is less than that prescribed by the statute of limitations. The object of the rule is to encourage diligence, and to discourage delay, by refusing equitable relief when the demand is stale, leaving the complainant to his remedy at law. The rule applies where the relief is based upon the ground of fraud, but there can be no laches until the fraud is discovered, or ought to have been discovered. 2 Pomeroy on Equity Jurisprudence [2 Ed.] sec. 817. But for the fact that the plaintiffs are infants, relief should be refused in this case.

The general rule is that laches is not imputable to an infant. Tyler on Infancy & Coverture [2 Ed.] p. 167. No laches of infants will prejudice their rights, because the presumption is that they do not understand their rights, and that they are not capable of taking

notice of the rules of law so as to apply them to their advantage. Chambers on Infancy, 416. It is a general rule that, as a person not *sui juris* cannot act on his own behalf, no laches can be imputed to an infant during the continuance of his minority. 12 American & English Encyclopedia of Law, 552, and cases cited. The exceptions stated to the general rule in the text books can have no application to the case in hand. *Napton v. Leaton*, 71 Mo. 358, is in line with the rule just stated. The delay in bringing this suit is excused by reason of the fact that the plaintiffs were and are minors. Indeed, they did not have a guardian until within two years before this suit was commenced.

The judgment of the circuit court is reversed, and the cause remanded, with directions to that court to set aside the deed. We speak of the deed alone, for nothing was said about the bill of sale on the trial further than to read it in evidence. Practically, it dropped out of the case, and we leave it where the parties have left it. If the plaintiffs demand an accounting, the court will proceed with that branch of the case, as to which we give no further directions. All concur.