AUGUSTA ULRICH, AMELIA BEYER, WALTER WERNER, ELLA WERNER, AMANDA McDANIEL, LONA WHALEY, JOHN WHALEY, IDA BROWN, CHRIST GUENZLER, EDWARD GUENZLER, WILHEMENA GUENZLER, LENA GUENZLER, ALICE GUENZLER, ARVIL GUENZLER, ARCHIE GUENZLER, MYRTLE GUENZLER, MELVIN GUENZLER, VIRGINIA WILSON, EULA BELL WILSON, BELLE FISHER, ALBERT HENDERSON, MARY C. DRINNER, WALTER D. DRINNER, ARCHIE W. DRINNER, JEROME G. DRINNER, ELROY L. DRINNER, ALTY DRINNER JONES, ANNIE DRINNER GUNN, GUY FRAZIER, JOE FRAZIER, HARVEY FRAZIER, JESSIE FRAZIER, ALBERT McDANIEL, EDNA McDANIEL, CORA RYAN, RAY McDANIEL, LEE McDANIEL, and DAISY FOX, Plaintiffs-Respondents, v. ANTON ZIMMERMAN and LAURA ZIMMERMAN, his wife, Defendants-Appellants.—163 S. W. (2d) 567.

Division One July 1, 1942.

*R. E. Kleinschmidt* for appellants.

774

*Matthes & Weier, James Booth* and *James L. Anding* for respondents.

DALTON, C.—This is an action in equity to set aside a warranty deed, dated June 20, 1939, executed by Edward McDaniel (now deceased) to defendants, and purporting to convey (subject to certain conditions and a life estate in the grantor) 256 acres of land in Jefferson County. Plaintiffs, some thirty-eight collateral heirs of the deceased, charge that the grantor lacked mental capacity to make the deed and that it was procured by undue influence of the grantees. The trial court found for plaintiffs and defendants have appealed.

Edward McDaniel (hereinafter referred to as deceased) was a single person and resided on the described real estate. A part of it had been deeded to him by his parents (in 1935) and the balance was inherited from his father. His father died April 15, 1938, his mother died May 27, 1939, and deceased died September 30, 1939, at the age of about 51 years. Deceased was the only child of his parents and he died intestate, leaving only collateral heirs. The farm in question was improved with a three-room house, a barn and machine shed and, according to the one witness who would express an opinion on its value, was worth about $6000.

For more than twenty-five years deceased had suffered with some sort of nervous trouble which resulted in a palsied condition. He was nervous, couldn't hold his head still, trembled, jerked and shook all over. He required assistance in eating, drinking and smoking. After 1929 he was unable to walk. His limbs were atrophied and semi-paralyzed, so that he was unable to use crutches, but "he would scoot around on the floor by the use of his arms and hands." According to Dr. A. L. Hertel, deceased was suffering from carcinoma of the liver and anterior poliomelitis or degeneration of the posterior cord of the spinal column, both progressive diseases which grew steadily worse. There was no connection between the two diseases. He also suffered from ascites or fluid in the abdominal cavity, caused by carcinoma of the liver, and had to be "tapped" occasionally. Dr. John

F. Roesser described deceased's trouble as inflammation of the kidney, "nephritis" or Bright's disease, which caused his feet to swell and later caused his death. He did not treat deceased for his nervous condition and found nothing wrong with the spine or liver. According to Dr. Martin Dalton, deceased suffered from a nervous or palsied condition and carcinoma (cancer) of the liver which caused abdominal dropsy. By reason of his nervous affliction, deceased was unable to talk plainly. He talked like a tongue-tied person and would repeat words, or there would be delay between words. Persons who were well acquainted with him had no difficulty understanding him, as "he could make himself understood to anybody used to him." Witnesses described his general physical condition as "awful bad," "pretty bad," "pitiful," "critical," "helpless" or the worst they "had ever seen a living man." On the other hand, many of these same witnesses said he was "mentally all right;" and that he had a sound mind and was mentally able to transact his own business.

His father and mother had taken care of him for many years. After the mother died an uncle stayed with deceased about a week, and then Ray McDaniel, one of the plaintiffs, and Hattie, his wife, both cousins of deceased (who had rented part of the farm from him), looked after him for about three weeks. Deceased then sent for defendants and made some oral arrangements with them to come and take care of him. On the eleventh day after the defendants came to live with deceased, the deed in question was executed.

The deed, upon an ordinary warranty deed form, recited a consideration "of $1.00 ▮▮▮ and covenants and agreements herein-contained." The grantor reserved a life estate in the premises and the right "to receive all rents and profits . . . during his natural life." The deed further provided: "Grantor herein is in poor physical condition, being afflicted with a disease which requires constant care and attention by others, and this deed is therefore made to grantees herein, as tenants by the entirety, on the expressed condition and assumption that said grantees, or the survivor thereof, shall provide grantor with a suitable home as a member of their family, on said premises, where all the parties now reside; that said grantees shall provide proper and suitable support and maintenance on said premises for grantor herein, for and during his natural life, including all necessary food, lodging, clothing, medical, dental or hospital attention, and shall provide said grantor with a suitable funeral and burial paying all necessary expenses thereof, and shall in all respects support and maintain him, in a suitable manner in accordance with his necessities, for and during his natural life, the said grantor expressly reserving the life estate in all of the above described real estate for and during his natural life, with remainder to said grantees, or the survivor thereof, provided said grantees, or the survivor thereof, shall faithfully comply with the conditions herein relative to the sup-

port and maintenance of said grantor, including all medical attention necessary and the payment of his funeral bill."

The only witness to express an opinion on deceased's expectancy was Dr. Hertel. He first saw deceased in July, 1939. At that time no one could tell the reasonable probability of deceased's life, but three years would not have been unusual. Witness then thought deceased had a year or more to live, and was surprised that deceased died so soon, particularly in view of his improved health condition in August, 1939.

Before deceased sent for the defendants, Ray McDaniel and his wife Hattie had advised deceased that they could not take care of him; that the work was too hard; and that they couldn't run both places (their own, about a half mile away, and his). Hattie had been staying with deceased in the daytime, looking after deceased, and also feeding the stock and milking the cows. Ray had been staying with deceased at night. They had been paid nothing for their service, except that Hattie was paid $7.00 for cleaning up and washing after deceased's mother died. It appears, however, that at the time Ray was indebted to the deceased on a note for $75.00. It further appears that after deceased's mother died deceased told Ray: "I will will you and your wife the place if you will take care of me," but no agreement was reached. Later deceased wanted to come and stay with Ray and Hattie in their home and furnish his own board and have their children wait on him (get him drinking water and a smoke), but he didn't say what he would pay in addition to his board. Hattie admitted that if deceased had agreed to pay more, they would have taken him to their home, or if he had offered free rent on his farm they would have taken it. They continued to take care of deceased while he was trying to get some one to take care of him and, during May and June, Ray took deceased to see Dr. Roesser five or six times and to Dr. Dalton once.

Shortly after his mother's death, deceased asked Mrs. Ida Merkel and her son of St. Louis to come and stay with him and said he would pay them. He said he wanted to stay on the farm where his mother and father had died, and that he would pay $2.00 per week, and they would be well fed, but he didn't offer any further payments and they declined. Deceased then had Hattie write and ask Emma Whaley of St. Louis to come down. She came, and deceased asked her to take care of him and the stock and garden. He offered to furnish everything and pay $2.00 per week. She said she would think it over and let him know, but didn't let him know. She said he offered to take her as "second choice" and didn't pay her expenses down from St. Louis. Deceased then tried to get Herman Springmeyer and his wife, neighbors, to come and stay with him and wanted to know what they would want. They wanted $90.00 per month and thought it would be well worth it, but deceased only offered

$20.00 per month and agreed to furnish groceries and everything. Deceased finally raised the offer to $25.00 and later to $30.00 per month, but got no definite answer. When sometime later, they decided to accept the last offer, deceased said he had made different arrangements. It was after these efforts to hire assistance, that the deceased sent Hattie and her daughter to see the defendants, and to ask them to come over and see him about staying with him and taking care of him. Mrs. Zimmerman was a second cousin of deceased and lived only a few miles away. Hattie went ■■■ at night and found the Zimmermans in bed, but delivered the message and talked the situation over. The next day (June 9, 1939), the Zimmermans came over and had a long conference with deceased. Deceased then told Hattie she could go, but to come back that night and show Mrs. Zimmerman how to feed and milk, and she did so. According to Hattie, previous to that time, Mrs. Zimmerman had said to her, ''I'm sure surprised you and Ray haven't moved in'' and Hattie had replied: ''Ed never said any more about willing us the place.''

Concerning the execution of the deed, the evidence shows that on June 20, 1939, Mr. and Mrs. Zimmerman and deceased came to Dittmer in deceased's automobile and asked George Bruns, a notary public, to write a will. Bruns testified that ''all said the same thing, that they wanted me to write a will for Edward McDaniel.'' Bruns had never written a will and told them to see a lawyer. They then drove to Oermann, and stopped to see Henry Kramme. Deceased told him he was going to make a will, asked him to come go to Hillsboro to witness the will. They all talked about it, but the witness could not go. The party then went to Hillsboro, where the deed in question was prepared, signed, acknowledged and recorded.

While in Hillsboro, deceased told the cashier of the Hillsboro Bank that he wanted to deed the farm to the Zimmermans, so that they would not leave him like his relatives had done. Later he inquired of another person as to whether he thought the Zimmermans would stay with him, as they had agreed. Three persons, who were present in the bank when the deed was executed, testified for defendants. The attorney Kleinschmidt, was called by plaintiffs, but was of no aid to plaintiffs' case. Defendants did not attempt to testify concerning the execution of the deed.

After the deed was executed defendants continued to live with and look after the deceased until his death on September 30, 1939. They paid his doctor bills from time to time, paid $75.00 for a monument and paid his funeral expenses and other items in the sum of $850.

Immediately after the deed was recorded, difficulties arose with deceased's relatives, with reference thereto. Ray McDaniel, one of the plaintiffs who admitted he had been very active in consulting attorneys and bringing this suit, testified that deceased accused him

of having sent word not to make a will in favor of Zimmermans. Ray denied he had said anything about it. Hattie, Ray's wife, testified that deceased got angry and complained to her on August 4th about Ray and her father talking about his business. Deceased inquired of her what business Ray and her father had looking into his business, "why they were meddling in his business." At that time Hattie testified they knew about the deed to Zimmermans, although, the deceased had not told them. They had already consulted an attorney, since, in referring to her husband and father, she said: "They had been authorized by attorney Booth to come to look at what they (Zimmermans) had done." Hattie further testified that she "fell out" with Mrs. Zimmerman, shortly after the Zimmermans began to care for deceased. In July, 1939, Dr. Hertel asked deceased, in Dr. Dalton's presence, if he had any relatives and deceased replied: "Sure! They don't come near me. To hell with them." Deceased further told Dr. Hertel about the Zimmermans taking care of him. Deceased told E. O. Prattle that he was deeding everything he had to the Zimmermans for taking care of him the rest of his life. Deceased further said: "Some of the heirs is going to cause them trouble and they are taking as good care of me as my father and mother." Deceased asked him to be a witness for Anton and Laura (defendants) appellants. Deceased told various persons that everything would be Zimmermans after his death. He said, "I am giving them everything that I have, after I die." He said he wanted to give them everything for the work they were doing for him. He told others that as long as he lived, everything was his, but after his death it would be Zimmermans, and that after his death some of his heirs would try to get his property.

The record further shows that, after it was apparent that his collateral kin were dissatisfied with what had been done with reference to the deed, deceased began to dispose of the rest of his estate. Over the objection and exceptions of defendants that the evidence had no probative force as to the circumstances concerning the execution of the deed and the issues here involved, plaintiffs were permitted to show facts happening long after the execution and delivery of the deed sought to be set aside in this proceeding. Some of such facts are the following: On July 20, 1939, deceased had a public sale of practically all of his household and kitchen furniture, farm implements and livestock (except three cows). Mr. and Mrs. Zimmerman bought in some of the furniture, feed, tools, a Ford car, two cows, two calves and two mules, all for a total of $403.05. They did not pay for the things purchased and, according to their answer to certain interrogatories filed in the probate court, the deceased refused to accept any part of the purchase price for the articles and advised them that he was going to give them the property; that he didn't

want the mules to leave the farm; that all the property bid in was a gift to them; and that he wouldn't need it any more.

On August 5, 1939, the day following his talk with Hattie about her husband and father, deceased sent for J. O. Craig, who owed him a note for $500. Mr. Craig came over and deceased collected the interest due and then had the old note destroyed and a new one made to Mrs. Zimmerman. On the same date deceased saw Fred L. Dryer who owed him a note for $1000 and asked him to come over. He came and deceased had the old note destroyed and a new one made to Anton Zimmerman, and also an interest note for $190.00. On August 8, 1939, deceased sent for Conrad Oermann who owed him a note for $100. Deceased had the old note destroyed and a new one made to Anton Zimmerman. Deceased had collected a $75.00 note from James McDaniel, and the Zimmermans had borowed the money in February, 1939, and given a note, due in one year. This note was returned by deceased to the Zimmermans and destroyed after the deed, here sought to be set aside, was executed.

Deceased had two certificates of deposit issued by the Farmers and Merchants Bank of St. Clair for $300.00 and one for $100.00 which were cashed, one July 28th, one September 6th, and one September 26, 1939. Mr. Zimmerman presented the certificates, collected the money, and delivered it to deceased. Deceased gave it to Mrs. Zimmerman for herself and her husband to do with as they pleased. Deceased, also, had a $550.00 certificate of deposit issued by the Jefferson Trust Company of Hillsboro. It was cashed by defendants at deceased's direction on September 26, 1939. State and county taxes in the sum of $81.76 were paid, and a new certificate of deposit was issued at deceased's direction to Mrs. Zimmerman. Prior to his death, deceased also gave the Zimmermans 120 bushels of corn and some knives, forks and bed clothes. Defendants claimed all of this personal property in the probate court, as gifts inter vivos after the execution of the deed, but we are not here concerned with that issue. Deceased, however, had other certificates of deposit for a total of $825.-00, a draft for $148.83 and other personal property, which was not disposed of and which came into the hands of deceased's administrator. It is admitted that the real and personal property claimed by defendants was not included in the inventory of deceased's estate. We think the above evidence, all of which was objected to, was competent and admissible under the issues here, but its value was limited because of its remoteness and other intervening circumstances. It was within the discretion of the trial court to receive the evidence for what it was worth. Ordinarily in this type of case the evidence properly takes a wide range. [26 C. J. S., Deeds, p. 622, sec. 200, b, and c.] Other facts will be stated in the course of the opinion.

Defendants, here, contend that the evidence was wholly insufficient to establish that deceased was of unsound mind, or that the

deed was obtained by undue influence of the grantees, and say the decree is not supported by substantial evidence. On appeal in an equity case, the cause is heard de novo and we determine the weight and value of the evidence, however, this court will usually defer to the findings of the chancellor, especially where there is conflicting verbal testimony involving credibility of witnesses who appeared before him, except when convinced that his findings are against the weight of the evidence. [Shaw v. Butler (Mo. Sup.), 78 S. W. (2d) 420, 421.] We must keep in mind that the burden of proof to establish the lack of mental capacity of the grantor and undue influence on the part of the grantees was upon the plaintiffs, and that, after full performance of the terms and conditions of the deed by the grantees and the death of the grantor, a court of equity will not exercise its extraordinary powers to vacate and set aside a deed, except in a clear case, where the evidence of mental incapacity or undue influence is clear, cogent and convincing. [Lastofka v. Lastofka, 339 Mo. 770, 99 S. W. (2d) 46, 54; Shaw v. Butler, supra (78 S. W. (2d) 420, 429); Cohron v. Polk, 252 Mo. 261, 278, 281, 158 S. W. 603; Platt v. Platt, 343 Mo. 745, 123 S. W. (2d) 54; Reaves v. Pierce (Mo. Sup.), 26 S. W. (2d) 611, 617; 12 C. J. S., Cancellation of Instruments, p. 1060, sec. 195.]

Although the petition alleged that "deceased received no consideration for the said purported deed," the allegation was unsupported by evidence. Plaintiffs urge only that "the record shows an abundance of evidence that grantor had the mind of a three or four year old child;" and that the facts and circumstances in evidence show the deed was obtained by undue influence of the grantees. Plaintiffs particularly insist that a confidential or fiduciary relationship existed, which coupled with the activity of the grantees, as shown, raised a presumption that the deed was obtained by undue influence; and say that such presumption made a case for plaintiffs which was not overcome by defendants' evidence. [Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400, 412.]

Space does not permit a full review of plaintiffs' evidence on the issue of deceased's mental capacity. Plaintiffs claim this evidence shows deceased "did not know and realize the nature and meaning of the deed he purportedly executed." About half of plaintiffs' witnesses testified that deceased's mental condition was all right; or they testified to facts indicating that he was of sound mind. Others said his mental condition was like it had always been. Two or three, who saw him in July, after the deed was executed, said he was feebleminded, like a child, or had the mind of a three or four-year-old child, but stated no facts to sustain such conclusion. Some other lay witnesses didn't think he was of sound mind, but were not able to state facts inconsistent with sanity. Other witnesses, who gave their reason for thinking his mind was not sound, testified to other facts

which strongly indicated that his mind was in fact sound and that they had dealt with, or attempted to deal with him in business matters, on the theory that he was of sound mind. Others said they didn't think he was crazy, but they didn't think he had his right mind.

Some of the matters mentioned by the several witnesses as showing mental incapacity were that he laughed and cried the night his mother was a corpse, acted queer, and told over and over a joke that the witnesses termed dirty; that he didn't recognize Hattie that night and thought she looked funny; that, when they talked of taking him to a hospital he didn't want to go, and acted like a child; that he talked too much and told people about his business and who owed him; that he told what he liked to eat, like a kid, and said he liked cabbage; that he said he was going to give the mules to Ray's son and then said he wanted to keep them to look at; that he promised Hattie some furniture and then sold it at the sale; that he gave Ray a block and tackle and then decided to keep it; and that he talked "foolish sometimes."

On defendants' behalf the three physicians who treated deceased testified that he was of sound mind. Some eight lay witnesses testified that he was of sound mind and others testified to facts indicating he was of sound mind, as for example, deceased, just prior to making the deed, settled his father's estate as administrator and sole heir, since his mother died before completing the administration, and deceased carried on other business transactions.

The opinion of a lay witness as to the insanity or lack of mental capacity of a person whose mental condition is under investigation has no weight or value, unless the opinion is founded upon facts which are inconsistent with sanity. [Lee v. Ullery, 346 Mo. 236, 140 S. W. (2d) 5, 11, and cases cited.] Even disregarding all of defendants' evidence on the issue of mental capacity, we think that the evidence of plaintiffs' witnesses, considering all facts and circumstances testified to by them, was wholly insufficient to show any lack of mental capacity to execute the deed in question. On the other hand, many facts and circumstances were shown which strongly indicated deceased was of sound mind, and was so regarded by those who knew him well.

In support of their claim of fiduciary relationship and undue influence, plaintiffs contend that deceased was a helpless invalid and the Zimmermans were taking care of him; that he was under the domination and control of the Zimmermans; that the relationship of nurse and patient existed; and that the Zimmermans were active in procuring the deed. They further contend that the contract set out in the deed was unfair and unreasonable, an unconscionably hard bargain, and that deceased's mental condition was not equal to that of defendants at the time the deed was made. Respondents rely on various facts, to-wit, that Mrs. Zimmerman was a second cousin, had known deceased a long time and lived near him; that after deceased's mother

died, deceased told Hattie that Mrs. Zimmerman had told him they didn't own the farm where they lived, and they could come and take care of him; that after deceased had sent for the Zimmermans, but before they came over to see him, Hattie told deceased, Mrs. Zimmerman was "long-fingered," and deceased replied that he knew it and would "attend to the pocket-book himself;" that, when Hattie advised Mrs. Zimmerman that she and Ray were going to quit taking care of deceased and that deceased wanted the Zimmermans to come up the next day to see about taking care of him, and after Hattie and Mrs. Zimmerman had talked about deceased and the situation, Mrs. Zimmerman stated: "I think if I could go over I could make him see things;" that the Zimmermans had moved in with deceased on June 9, 1939, and were living with him; that deceased couldn't take care of himself and needed some one to feed and wait on him; that on June 19, 1939, Mrs. Zimmerman came to Hattie's residence and asked for, and received, a list of deceased's prospective heirs, as far as they were known, and told Hattie she wanted to get everything in black and white so that after Ed (deceased) was dead the others could not come in and put her out; that Zimmermans rode in deceased's automobile to Hillsboro when the deed was made; that Mr. Zimmerman drove the car; that they all (deceased and Zimmermans) told George Bruns, the notary public at Dittmer that they wanted him "to write a will for Edward McDaniel;" that Mr. Bruns told Mr. Zimmerman in the presence of all of them to get a lawyer; that Mr. Zimmerman did most of the talking when they stopped at Mr. Kramme's to get him to go along and witness the will; that apparently no deed was planned until they arrived in Hillsboro; that Mr. Zimmerman went upstairs to Kleinschmidt's office and told him deceased wanted a deed written, but could not get up the steps to the office; that Mrs. Zimmerman told the cashier of the bank they had a man that wanted to make a deed and they didn't think he was able to get up to Kleinschmidt's office; that Mr. and Mrs. Zimmerman assisted deceased into the bank instead of up to Kleinschmidt's office; that Mr. Zimmerman paid the attorney for writing the deed; that when the description of the land was discussed Mrs. Zimmerman said it was the Lafayette McDaniel farm; that Mr. Kleinschmidt conferred with Mr. and Mrs. Zimmerman, as well as with deceased, before the deed was written; that Mrs. Zimmerman held her glasses in front of deceased when he signed the deed by mark (he being too palsied to write his name), and she held a book under his arm; that when Mr. Williams, the cashier of the bank, could not understand deceased, Mrs. Zimmerman could, and "she was sort of acting as an interpreter" and deceased would approve by "shaking his head up and down, as if he wanted to say yes;" that Kleinschmidt and Williams hadn't known deceased before and could not understand him well; and that Mrs. Zimmerman did much of the talking and told those present in

the bank they were going to take care of deceased and wait on him like a child. In addition to these facts plaintiffs rely on the circumstances stated, supra, happening after the execution of the deed on the theory that, in effect, all was a part of one transaction.

■■ We think the evidence wholly insufficient to establish a confidential or fiduciary relationship, prior to the execution of the deed. There was no evidence as to what arrangements were made before the Zimmermans agreed to come, or did come, to live with deceased, but within ten days thereafter, one of the defendants stated that she wanted things in black and white. The following day all went to see a lawyer. The deed as prepared, executed, delivered and recorded. Both the cashier and president of the Bank of Hillsboro (the latter was the attorney) discussed the matter at length with deceased. Deceased knew what he was doing and why he wanted to do it. There was no evidence of fraud, deceit, duress, coercion, or undue activity by the defendants, or that deceased, trusted, considered or relied upon any suggestions or advice from them. There was no evidence that the defendants were in the management and control of deceased's business or that there was any special trust with respect to the property in question. Trust, confidence and undue influence are not shown. Deceased sent for defendants after having made a somewhat similar proposition to one of the plaintiffs, and after he had been unable to secure other persons to live with him upon the terms he suggested. We are unable to see how the deed was unfair, unreasonable or a hard bargain, as far as deceased was concerned, concerning all the facts and circumstances in evidence. Defendants by accepting the deed assumed a definite responsibility and deceased's expectancy was uncertain. In any case, deceased was mentally competent to dispose of his property in accordance with his own desires, and the undue influence charged was not proven.

■ ■ Undue influence, to be sufficient to warrant a court of equity in setting aside a deed, must be such overpersuasion, coercion, force, or deception as breaks the will of the grantor and puts in its stead the will of another. [Shaw v. Butler, supra; Monroe v. Lyons, 339 Mo. 515, 98 S. W. (2d) 544, 547; Lynn v. Coates (Mo. Sup.), 142 S. W. (2d) 1014, 1020.]

The fact that the conveyance passed the property to a second cousin and her husband, rather than to deceased's first cousins and collateral relatives, is immaterial here. [Shaw v. Butler, supra (78 S. W. (2d) 420, 431) and cases cited; Lynn v. Coates, supra (142 S. W. (2d) 1014, 1020.]

Plaintiffs rely upon Dingman v. Romine, 141 Mo. 466, 42 S. W. 1087; Martin v. Baker, 135 Mo. 495, 36 S. W. 369; Kroenung v. Goehri, 112 Mo. 641, 20 S. W. 661; Morris v. Morris (Mo. Sup.), 4 S. W. (2d) 459; Hershey v. Horton, 322 Mo. 484, 15 S. W. (2d) 801; Manahan v. Manahan (Mo. Sup.), 52 S. W. (2d) 825; Stone et

al. v. Hohmann, 347 Mo. 184, 146 S. W. (2d) 551; Heflin v. Fullington (Mo. Sup.), 37 S. W. (2d) 931; Soureal v. Wisner (Mo. Sup.), 13 S. W. (2d) 548; Dimity v. Dimity (Mo. Sup.), 62 S. W. (2d) 859; and other cases, but under the record in this case, those cases are not controlling.

To raise a presumption of undue influence, as contended for by plaintiffs, there must be both confidential relationship and facts and circumstances tending to show undue influence. [Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, 777.] Of course, undue influence may be inferred from facts and circumstances, but mere suspicion of or opportunity for undue influence are insufficient. [Fessler v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17, 23.]

Every case of this kind must be decided upon its own facts, and since we are unable to find substantial proof in this record of either mental incapacity or undue influence, our conclusion is that the judgment should be reversed and the cause remanded, with directions to dismiss plaintiffs' petition. It is so ordered. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.