FLORA ANAST and ELFRIEDA STOTLEMEYER v. ARTHUR C. CZERWENKA, IRENE F. CZERWENKA, Appellants, and MATILDA PAUSLY, Respondent.—No. 40014.—203 S. W. (2d) 463.

Division Two, June 9, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, July 14, 1947.

*Hay & Flanagan* and *S. D. Flanagan* for appellants.

*Sigmund M. Bass, John Grossman* and *Sam Hatupin* for respondents Flora Anast and Elfrieda Stotlemeyer.

*Robert G. Winter, Yeckel, Leffler & Zepf* and *Louis F. Yeckel* for respondent Matilda Pausly.

WESTHUES, C.—This is a suit in equity to set aside a deed conveying property to defendant, Arthur C. Czerwenka, or to establish a constructive trust in favor of plaintiffs and defendant Pausly. The trial court, by its judgment, decreed that defendant Arthur Czerwenka held the property in trust and also decreed partition. From the judgment Arthur Czerwenka and his wife, Irene F. Czerwenka, appealed.

The real estate in controversy consisted of a flat and a bungalow located at 4140 and 4142 Delor Street, St. Louis, Missouri. It was owned by John Czerwenka, who, at the time the deed in question was alleged to have been signed, was eighty years of age. There were four children, namely plaintiffs, Flora Anast and Elfrieda Stotlemeyer, and defendants, Arthur Czerwenka and Matilda Pausly. The mother of these children preceded her husband in death. Plaintiff, Flora Anast, was married in 1941. She had, prior to that time been living with her father and taking care of the home. When she married she established her own home and thereafter the defendant, Matilda Pausly, who lived nearby, often aided in taking care of her father's house. She also went with him to various places on matters of business, one being the office of Yeckel, Leffler and Zepf, a firm of lawyers. On several occasions the matter of making a will was discussed. Mr. Czerwenka, however, ▮▮▮ was not ready to do so and did not make a will. About December 28, 1942, the defendant, Arthur Czerwenka, and his wife came to the home of John Czerwenka

and remained there until his death on January 24, 1943. The evidence as to why Arthur and his wife came to the home of Arthur's father is very much in conflict. A number of witnesses testified that Arthur lived near Fenton, Missouri, in a clubhouse and that due to high water which surrounded the house he went to his father's home and asked to stay there until the water receded. Arthur contended he went to live with his father because he had been asked to do so. Theodore E. Sentner, a grand-nephew of John Czerwenka, lived with his uncle for about four months prior to his death. Sentner at the time was attending school. On Saturday morning, January 16, 1943, he found his uncle on the floor of his room unable to get up. He called others in the home and Czerwenka was helped or placed in bed and a doctor summoned. The doctor stated Czerwenka had suffered a hemorrhage of the brain causing paralysis. Dr. William Koutsoumpas was called to see him on Sunday, January 17. He testified that "he was in a comatose condition, semi-conscious, had a hard breathing, and apparently he was suffering from the effects of a cerebral hemorrhage." The doctor further testified as follows:

"I said that the man was unconscious, in a semi-comatose condition. He could not carry on a conversation. The man could not talk, and naturally I could not judge his mentality. The man was comatose, semi-conscious.

"Q. Would he be able to understand what you tried to tell him, doctor, or ask him? A. The day I examined him, gentlemen, he was not able to understand anything."

On the following day, January 18, Mr. Yeckel called at the home at the invitation of Mrs. Pausly. He testified that he talked to the defendants, Mrs. Pausly and Mrs. Irene Czerwenka, but did not see John Czerwenka on that day; that Mrs. Pausly informed him that her father was very ill and that she wanted the witness to prepare a deed to the property conveying title to defendant Arthur Czerwenka, her brother; that Mrs. Pausly further stated that in case their father died the brother would divide the property among the four children share and share alike. Mr. Yeckel testified that he explained the dangers of such a transaction and suggested that Mrs. Pausly's name also be in the deed as grantee and that Mrs. Pausly said that Arthur was the man of the house and she felt he would do the right thing. The purpose of deeding the property to Arthur and having it divided by him was to avoid costs of administration. The deed was prepared and the following day, January 19, Mr. Zepf and Mr. Yeckel returned to the Czerwenka home to have it signed and acknowledged. Mr. Yeckel testified that he, Mr. Zepf, Mrs. Pausly and Mrs. Czerwenka had a discussion as to whether the father was capable of understanding the transaction; that thereafter they went upstairs and the father was introduced to Mr. Zepf. The evidence of these parties was that Mr. Czerwenka nodded and smiled; that then Mr. Yeckel explained

the deed and its purpose and effect to Mr. Czerwenka and asked him if he understood; that in response Mr. Czerwenka nodded his head and smiled. Mr. Czerwenka, who was then propped up in bed, with the aid of Mrs. Pausly holding his hand, signed the deed. It must be noted here that the evidence conclusively shows that Mr. Czerwenka was unable to talk or write after the paralytic stroke. When the deed was thus signed Mr. Zepf affixed the acknowledgment thereto. Both Mr. Zepf and Mr. Yeckel testified that in their opinion Mr. Czerwenka was of sound mind and understood what he was doing. It is important to note that the deed was signed on January 19, two days after Dr. Koutsoumpas called at the home. On the next day, January 20, Dr. Herchenroeder called to treat the patient and his testimony with reference to his condition was as follows:

"A. He had a cerebral hemorrhage is what he had, causing him to have an apoplectic stroke, and that in turn produces a disturbance in his breathing, and his heart actions, which of course is a condition which you find frequently in aged people.

"Q. Doctor, how does cerebral hemorrhage affect the patient's mentality? A. Well, it gradually follows up with insensibility by reason of the fact that the discharge of the blood in the cranium formation, different sinuses of the brain, respiratory sinus and the sinus affecting the speech, and others and in that way it makes the patient rather semi-conscious, to begin with, and gradually they go into a somnolence state.

"Q. How does that affect their ability to transact business? A. They could not do that.

"Q. How is that? A. They would not be able to transact any business in that kind of a state.

"Q. Would they be able to comprehend the solemnity of a warranty deed, a deed conveying property? A. I wouldn't think so, the condition he was in when I saw him."

Mrs. Pausly testified as follows with reference to instructions given to Mr. Yeckel:

"Q. (Interrupting) Did you give him any instructions with reference to what you wanted done with the property? A. He said to put all four children's names on the property. And I said, well, that I thought that it would be right for Arthur to have it; that it would be all right for Arthur to have it in his name. And so we went upstairs.

"Q. What else did you say? A. That was all that I said to him.

"Q. Did you say what Arthur was supposed to do with the property? A. Yes, sir, divide it into four equal parts.

"Q. Well, did you say that? A. I said that to Mr. Yeckel, that he would divide it into four equal parts."

As to what transpired when the deed was signed Mrs. Pausly testified as follows:

"Q. What transpired upstairs? A. Well, when they went upstairs, he talked to Papa and asked him if he wanted it that way. Well, he could not answer him.

"Q. So what was done? A. Well, I propped him up a little bit, and then after that, he asked me to sign—he told Papa he should sign, he put the pen in his hand and he could not write, and so Mr. Zepf said, 'You try to write,' and I said I could not, and Irene was just six feet away from me and she come up to me and she said, 'you take Papa's hand and write,' and that was all.

"Q. Did you take his hand? A. Yes, sir, I took his hand." Mr. Zepf testified that he asked Mr. Czerwenka if he acknowledged the execution of the deed to be his free act and deed and that in response thereto Mr. Czerwenka indicated his approval "by smiling and nodding his head." Mr. Zepf was not acquainted with Mr. Czerwenka.

The trial court found and decreed that Arthur Czerwenka took title to the property subject to a constructive trust and that he was obligated to divide it among the four heirs share and share alike. Certainly if the deceased signed the deed with the understanding that the son would divide the property among the children, then it would constitute a gross fraud for the grantee, the son, to retain title unto himself. Arthur Czerwenka, however, claimed the whole title because of an agreement he had with his father wherein he and his wife were to live with the father and take care of him and in return receive the property. Evidence was offered in support of this contract, but the trial court excluded it holding that defendants, Arthur Czerwenka and his wife, were incompetent witnesses to testify concerning a contract with the deceased. The trial court, however, did not exclude any other evidence that defendants may have had to support such a contract. Had the trial court admitted the evidence of the defendants and had they testified as indicated it would not have justified a decree in defendants' favor. All the surrounding circumstances tended to refute any such contract. However, we need not discuss this question further in view of the conclusions we have reached.

The trial court's decree is based on the theory that the deceased realized and understood the transaction when he signed the deed. On appeal in an equity case the cause is heard de novo. Due consideration is given to the findings of the trial chancellor and the fact that he was in a better position to weigh the evidence than this court. Ulrich v. Zimmerman, 349 Mo. 772, 163 S. W. (2d) 567, l. c. 571 (2-5). In this case, after careful consideration of the record, we find ourselves in disagreement with the trial court's finding. We are firmly convinced that the deceased did not understand or realize what he was doing at the time the alleged deed was signed and acknowledged. Our reasons for this conclusion may be briefly stated. The evidence shows that on a number of occasions deceased had discussed the making of a will with lawyer Yeckel and Mrs. Pausly. The will, however, was

never prepared because Mr. Czerwenka was not ready to do so or had not made up his mind. There is no evidence in the record that the deceased ever mentioned or stated that he intended to deed the property to anyone for the purpose of having the grantee divide it to save expenses of administration. That idea was the brain child of the defendant, Mrs. Pausly. The evidence shows conclusively that the deceased, after he was stricken and up to the time the deed was signed, was unable to talk or write. He was in a semiconscious condition. How then could he have directed the deed to be prepared and explained its purpose? In fact we find from the evidence that Mr. Yeckel and Mrs. Pausly had a discussion as to who should be the grantee or grantees. Mrs. Pausly made the final decision and the deceased wasn't even consulted or told that this was to be done. At the trial she did not contend that her father had given her any instructions with reference to making a deed. Mrs. Pausly in consultation with Mr. Yeckel decided what to do and then presented the deed to the deceased, who, as the evidence shows, approved by nodding his head and smiling. On the day the deed was to be signed, the parties, that is Mrs. Pausly, Mrs. Czerwenka, Mr. Yeckel and Mr. Zepf, had some doubt as to whether deceased would be able to understand the transaction. It was later concluded that he did, because he noded his head and smiled. Nodding the head and smiling were the only outward expressions that could be elicited. In fact, the evidence was that deceased nodded and smiled to everything that was said. He did this in response to being introduced to a stranger, when an acquaintance spoke to him, or to any question that was asked him. Two doctors, one who saw the deceased on Sunday, the day before instructions were given as to the making of the deed, and another who saw him on Wednesday the day after the deed was signed, testified that the deceased was totally unable to understand any business transaction. There is no indication in the record that the deceased was any better on the day he signed the deed than he was on the days the doctors saw him.

Plaintiffs on this appeal do not urge this point strongly, that is, the incompetency of the deceased to comprehend what he was doing. They claim, however, that due to the deceased's condition he was easily influenced and was so influenced by Mrs. Pausly. We can understand plaintiffs' situation. The plaintiffs charged in their petition that defendants, including Mrs. Pausly, committed a fraud upon them. Defendant Pausly, by her answer, joined plaintiffs in requesting the court to decree partition on the theory of a constructive trust. Respondent, Pausly, could not consistently contend that the deed was the result of undue influence or that the deceased was of unsound mind. Witnesses Yeckel and Zepf are in the same position. Yeckel, Leffler and Zepf were attorneys for Mrs. Pausly. We hold that the deed in question was in fact the creation of Mrs. Pausly. Not that it

was executed as the result of undue influence, but because deceased did not at the time he signed it realize or understand that he was signing a deed. We therefore hold the deed to be a nullity. 18 C. J. 218, sec. 131, 26 C. J. S. 261, sec. 54(b); Vining v. Ramage, 319 Mo. 65, 3 S. W. (2d) 712, 1. c. 721 (5, 6).

Appellants cite many cases, for example: Ulrich v. Zimmerman, 349 Mo. 772, 163 S. W. (2d) 567, 1. c. 574 (9); Burgdorf v. Keeven, 351 Mo. 1003, 174 S. W. (2d) 816. The question of undue influence was considered in those cases. It was held that a ▮▮▮▮ person of old age and infirm may contract so long as he understands the contract and no undue influence is shown. In the case before us the deceased was old, but the evidence does not show that he was infirm before he suffered the stroke. Neither does the record show that any undue influence was practiced. In fact there is no evidence that the subject of making a deed was ever suggested before the deceased became ill. The evidence, however, does show that after the deceased became ill he could not comprehend or understand any business transaction and therefore could not convey to others information and instructions about business matters. As the doctors testified, he was in a semi-conscious or comatose condition and in addition to that, as the result of the hemorrhage of the brain, he could not talk or write.

While our conclusions drawn from the evidence are at variance with those of the trial court, the result, in so far as it affects the interest of the parties, plaintiffs and defendants, is the same. Having concluded that the deed was a nullity other questions briefed need not be discussed. The result is that the parties plaintiff, Flora Anast and Elfrieda Stotlemeyer, and the defendants, Arthur Czerwenka and Matilda Pausly, are owners in common of the real estate here in question, each being entitled to a one-fourth undivided interest therein. The trial court decreed that an accounting should be had as to the rents collected after the death of deceased; also, that partition should be had. Those orders and judgments were correct. The cause is therefore reversed and remanded to the trial court with directions to enter a new judgment holding the deed to be a nullity, decreeing that the four children are owners of the property as tenants in common and decreeing partition and an accounting for the rents. It is so ordered. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.