**McELROY v. MATHEWS.**

No. 43449.

Supreme Court of Missouri.
Division No. 1.

Dec. 14, 1953.

Beeson & Dabbs, David P. Dabbs, George L. Walker, Kansas City, Walter A. Raymond, Kansas City, of counsel, for appellant.

Howell, Jacobs & Howell, Floyd E. Jacobs, Dean Wood, Kansas City, for respondent.

COIL, Commissioner.

Plaintiff-respondent, administrator of the estate of Cora L. English, deceased, sued to cancel a purported contract between Miss English and defendant-appellant on the ground, among others, that she lacked mental capacity to contract. The trial court found the issues for plaintiff, adjudged the purported contract to be void, and directed defendant to turn over to plaintiff the shares of stock received by him together with the dividends paid thereon. Defendant contends that the judgment is against the weight of the evidence.

Cora English was 90 to 94 years old when she executed the contract on October 13 (all dates, unless otherwise noted, are in 1949). She died on December 23. Until her retirement in about 1929, she had been a kindergarten supervisor in the Kansas City schools. Until about three years prior to her death she had been in reasonably good health. During her last years she began to physically decline; and in the summer of 1949, she was in a precarious physical condition due to angina pectoris, arteriosclerosis, coronary sclerosis, high blood pressure, and impaired vision (no sight in one eye and marked limited vision in the other). No question concerning her mental capacity prior to October 5 is here involved. On that date, she suffered a cerebral hemorrhage or, as often described in the evidence, a paralytic stroke. Her right side, including the right side of her tongue, was paralyzed. She remained bedfast until her death.

On October 13 she placed her mark (or her mark was placed) on the writing set forth below under circumstances presently to be related:

"This agreement, made and entered into this 13 day of October, 1949, by and between Cora L. English, party of the first part, and Lee E. Mathews, party of the second part, both of Independence, Missouri; Witnesseth, that,

"The first party does hereby sell to second part(y), and second party hereby purchases from first party three hundred seventy-one (371) shares of stock of the English Bros. Machinery Company, at Sixty-seven Dollars ($67.00) per share.

"In consideration of the delivery of said 371 shares to second party, he contracts and agrees to provide first party with current funds to meet her actual living expenses, medical and nursing care, so long as she may live, in the manner to which she is accustomed.

"Should the expenditures made by second party under this contract exceed the total sum of Twenty-four Thousand Eight Hundred Fifty-seven Dollars ($24,857.00), then second party shall be entitled to file a claim against the Estate of first party for such excess.

"Second party has caused the Aetna Life Insurance Company to issue a policy upon his life in the amount of $25,-000.00, with Cora L. English as beneficiary, which policy second party agrees to maintain with the premiums paid thereon to be treated the same as funds advanced to first party for living expenses; and payment of the face of this policy to first party shall discharge the estate of second party from any obligation under this contract, and the contract shall from thenceforth be for naught held.

"Should second party fail to supply the funds in the manner herein pro-

vided, he shall forfeit any right in the said 371 shares of Engish Bros. Machinery Company stock, and shall return same to first party.

"In witness whereof, the parties have hereunto set their hands, the day and year first above written.

her X<br>
"Cora Lydia. English<br>
Party of the First Part<br>
Mark<br>
Lee E Mathews<br>
"Party of the Second Part."

"Witness to her Mark:

"R. W. Street

"Mrs. Lily Davis

Before reviewing the conflicting testimony as to Cora English's contractual capacity on October 13, we should state some of the background and events leading up to the time the contract was signed. Miss English was the sister of C. C. and Tom English, both deceased, who, early in the 1900's, formed a family corporation which, at the time of trial, was styled English Brothers Machinery Co. She became the owner of 371 shares in this company. C. C. English's daughter, Helen, who died about 1940, also owned stock in the company. Helen English provided in her will that certain named employees of the company could purchase her shares at a price equal to 80 per cent of either the book value or the value fixed for federal estate tax purposes. (Her will was not in evidence and which of these values she specified was not established.) Cora English received $125 a month from Helen English's testamentary trust. Cora English owned the home in which she lived. This was sold for $12,500 after her death. Her annual income from the company stock varied but until 1949 it probably was not less than $2,200. She had accumulated other assets but apparently had used them, so that on October 5 her property consisted of her home and its furnishings, the stock, and the monthly income from the Helen English trust.

Ralph Street had been Cora English's personal attorney since 1910 and prepared the will she executed in January 1947. Her will provided that the 371 shares were to be offered for sale to the company employees who had theretofore purchased the Helen English stock, at a price, equal to 80 per cent of the book value at the time of the offer. The offer was to remain open for 90 days, after which any unsold stock was to be sold by her executor, Mr. Street (who later resigned), in the manner and for the price he determined. The proceeds from the sale of stock were left to Anna English, Tom English's widow, who lived in St. Louis. The book value of the stock in 1949 was $153.38 and in 1950, $166.43 per share. So, if the stock were offered in accordance with the will, the price to the offerees would be either $122.70 or $133.14 per share.

Fred B. Mertsheimer had been the company attorney and was a cotrustee of the Helen English trust. He had known Cora English for about 45 years and had prepared her income tax returns through 1948.

Defendant Lee E. Mathews, 55 years old, vice-president in 1949 and president in 1950 of English Brothers, had been with that company 37 years and had known Cora English for 35 years. He lived close to her, enjoyed her confidence, and performed many friendly services for her, such as fixing plumbing or lights in emergencies, taking items of food to her at her request, and invariably obtaining cash for her as she needed it, for which she gave him her checks. Mr. and Mrs. Mathews spent almost every other Sunday afternoon with her. Subsequent to October 5, Mathews took over the management of her household.

Early in October (the exact date is not established), Mertsheimer learned that Miss English's bank account was overdrawn in a small amount. He arranged with the bank to honor any outstanding checks, explaining that her $125 monthly check would be deposited in a few days. He then called her residence and learned she was ill. (Apparently this was the day of or the day after her stroke.) He said he had talked with her doctor who told him that Miss English

was in a desperate condition, might "go" any time, and that she might become unconscious within a short time. He then asked Mathews and Street to meet him to discuss her finances. According to Street, Miss English had called him and was greatly disturbed about her account being overdrawn and that he told her it would be handled. Street then learned that Mertsheimer had by then talked with the bank employees. Defendant, Mertsheimer and Street decided that cash was needed to meet Miss English's expenses, which, according to Street, were then about $70 a week for help, consisting of a maid, a practical nurse, and a trained nurse (this must have referred to a time subsequent to the stroke), in addition to the usual household expenses. Mathews agreed to loan Miss English either two or three thousand dollars and to take all her 371 shares of English Brothers stock as security. A note was prepared, probably for $2,000 (Street thought it was for $3,000 but had destroyed the note), which Street and Mathews took to her and which she executed by mark. Either the next day or two days later, Mertsheimer said, he again talked with Miss English's doctor and one of the nurses and they informed him that they had no idea how long she would live. He thought the $2,000 had been expended by then (information he thought he obtained from Mathews), and that other arrangements should be made. (However, up to October 13 Mathews had expended only $187.50.) Mertsheimer called other meetings of Street, Mathews, and himself (probably three), and they agreed that Mathews would advance money to cover Miss English's expenses for the rest of her life and that in some way Mathews would get the stock. Street drew the contract above set forth. Mertsheimer did not see it and knew nothing of the events surrounding the execution of the contract or note. He did insist upon the inclusion of the insurance security feature contained in paragraph 4. At one of the conferences, Street suggested a mortgage on the home, but Mertsheimer thought none could be obtained. No effort was made to borrow from a bank on the stock or home, and no effort was made to obtain any money from the employees or officers of the company mentioned in the Cora English will as offerees of her stock.

On October 13, Street and Mathews took the contract and the stock certificates (obtained from Miss English's safety deposit box, to which Street had joint access) to her bedroom where her marks were obtained on the contract and the two certificates.

According to Street, prior to and at the times of the execution of the note and of the contract, he understood that Cora's illness was "from a fall which incapacitated her and confined her to bed"; he did not understand that she had suffered a paralytic stroke but thought she had been badly crippled by a fall that he thought occurred in the first part of September. He did not discuss her condition with any doctor, but he saw her week after week "and heard the nurses talking about her condition." He knew that Dr. Ruth Andrews was Miss English's doctor and that she had been in constant attendance. Mertsheimer understood that Miss English had a blood clot but he didn't know what that meant, although it could have been "a blood clot of the brain." He said: "I don't know when it happened. I didn't inform myself very thoroughly about the woman's condition. I had nothing to do with the signing of the contract." He knew nothing of a heart attack on October 12 or that she was receiving injections of demerol (a synthetic narcotic used as a substitute for morphine) and knew nothing of her condition after the 12th. He had not actually seen her for about three years prior to her death. Defendant Mathews was called at the time Cora suffered the cerebral hemorrhage on October 5, and carried her up to her bedroom.

Turning now to a summarization of the testimony with reference to the condition of Miss English from and after October 5. Dr. Ruth Andrews, an osteopathic physician, with degrees from both medical and osteopathic schools, had been Miss English's physician for 25 years. She testified that she had been treating her throughout

the summer of 1949 for illness resulting from the various conditions heretofore set forth; Miss English weighed about 75 or 80 pounds; after seeing her on October 1 and 2, Dr. Andrews was out of the city for a few days and left her patient under Dr. Conner's care (Dr. Conner, also a female doctor, did not testify; at trial time she was in a hospital recuperating from an operation); Dr. Andrews saw Miss English on the 6th, the day after the stroke; there was a marked change in her physical and mental condition resulting from a cerebral hemorrhage suffered the day before; there was complete paralysis of the right side of the body including the right side of the tongue; Miss English "was in a rather stupor, semi-coma, I would say"; the brain had been damaged; she could not expel phlegm or feces, making their manual removal necessary; Dr. Andrews prescribed nembutal rectal suppositories to be used in addition to the digitalis and coramine which Miss English was taking for her heart condition; Cora English became progressively worse through the 7th, 8th 9th, 10th, and 11th, was in a stupor, didn't answer; Dr. Andrews was called between 2 and 3 a. m. during the morning of the 12th and found the patient's pulse rapid and weak, and evidently the cerebral hemorrhage was more severe; she seemed unconscious and was close to death; Dr. Andrews gave her a maximum dose injection of demerol and, when the drugstore opened, wrote a prescription for eight 100 mg. (maximum dose) ampules of demerol to be given every six hours as needed for pain; after three or four days Miss English "seemed to revive a little"; demerol tends to relax the arteries and causes drowsiness; later in the day of the 12th the condition had not changed; on the 13th, "Her condition had not changed any at all. She was absolutely the same. She could not have been any worse and lived, and she was just the same. She was unconscious. Absolutely"; the doctor saw Cora on the 14th; from the 14th to the 30th Dr. Conner "took over"; on the 30th the patient was in approximately the same mental and physical condition; Dr. Andrews saw her most every day until her death on December 23rd; she con-tinued to have intermittent heart attacks between the time of the stroke and her death. Dr. Andrews said that she (Dr. Andrews) talked on the phone with defendant Mathews two or three times after the stroke and, she thought, prior to October 14; she had described Miss English's condition to him as she had described it in her testimony and told him that she held no hope for Miss English's recovery. Dr. Andrews testified, without objection, that, in her opinion, between October 5 and October 14 Miss English was not mentally capable of transacting business affairs.

Defendant developed on cross-examination that an itemized bill submitted by Dr. Andrews failed to disclose any charge for either October 10 or 12. Dr. Andrews insisted, however, that she had seen Miss English on both of those days. Plaintiff adduced in evidence the properly identified prescription for demerol which Dr. Andrews wrote on October 12. Defendant also showed that the death certificate, signed by Dr. Andrews, contained these entries in her handwriting: under "Disease or condition directly leading to death" were the words "Cerebral hemorrhage", and under "Interval between onset and death" were the words "3 days". Dr. Andrews said "3 days" was an error on her part and that she meant "Three months".

Dr. B. Landis Elliot, a neurologist, who had not treated Miss English, answered a hypothetical question (which assumed the truth of plaintiff's evidence as to her condition following the stroke), as to whether "this woman possessed sufficient mentality to understand a business transaction, or any other transaction" by saying: "My opinion would be, assuming all those facts to be true, she did not have sufficient mental capacity to understand it." Dr. Elliot further testified that: a brain hemorrhage means that there has been blood poured out of an artery; it sometimes escapes in the brain substance, or outside in the subarachnoid space; a brain hemorrhage means brain damage if the blood has escaped in the substance of the brain; that sclerotic arteries are more likely to be a site of hemorrhage or a thrombosis; the result of

a brain hemorrhage depends entirely on where it occurs and how large it is; a brain hemorrhage may completely obliterate mentality and is, in most cases, fatal; people who survive "strokes" usually have suffered a thrombosis and not a hemorrhage, but some hemorrhages are mild and there might be physical paralysis and the mind remain perfectly clear; one who has suffered a brain hemorrhage might not live a week or might live a long while in a dangerous condition; the facts related in the question would indicate either a brain hemorrhage or a thrombosis; the mental and physical effects are very much the same; the fact that deceased had a degree of paralysis in her tongue and was unable to expel phlegm would tend to indicate that the site of the hemorrhage was the brain; thrombosis is the blocking of an artery by a blood clot; when blood to the brain is stopped by a clot, the brain is instantly injured to a degree and you have softening of the brain, so that when you have a thrombosis, you have definite brain damage and after the passage of two or three days, it gets worse.

Lily Davis, who had been Miss English's practical nurse and companion for four years immediately prior to her death, testified that: for two years prior to October 5 Miss English had poor eyesight and a bad heart and was confined to her bed much of the time; the witness read to her for as much as five hours a day; on October 5 witness found her downstairs in a condition which she (the witness) thought indicated a paralytic stroke; a neighbor came, Dr. Conner and defendant were called, and, after Dr. Conner had given Miss English preliminary attention, defendant carried her upstairs; her right side was paralyzed; she did not appear to know any one; witness called Dr. Andrews in the early morning of the 12th after Miss English suffered a heart attack and appeared to be dying; Dr. Andrews administered demerol and arranged for a prescription; Miss English was in a stupor after the injections of demerol; on the 13th, Street and Mathews (according to this witness and also Mertsheimer) went to Miss English's room and then called the witness, saying they wanted her to witness the signing of a "statement". The witness thus described the patient's condition at that time: "She didn't appear to know anything that was going on. She was just lying there, her eyes closed. She took no notice of anyone in the room. * * * Mr. Mathews picked up her little hand", her left hand, and made an "X". Witness then signed to show that she had seen the mark placed there; Miss English said nothing and did not appear to know that any one was in the room. Mrs. Davis said that Miss English grew steadily worse after the stroke and that the witness told Mathews that she could not possibly live long and kept him informed of her steadily deteriorating condition, and, specifically, told Mathews of the heart attack on the 12th. Mrs. Davis testified that: she witnessed Miss English's mark on a note two or three days after the stroke, when Mathews and Street were there in the room and Mertsheimer was downstairs; after the stroke Miss English gave no directions as to running the house as she had done before; witness tried to read to Miss English once or twice after the stroke but could discern no comprehension by her. Mathews reduced the witness's wages $5 per week.

Mattie Dehoney had been employed for 15 years immediately prior to Cora's death as a maid. She ordinarily worked from 7 a. m. to 1 p. m. She testified that: on October 5 Lily Davis called her after witness had left at 1 o'clock and said that Miss English had had a stroke; witness returned about 4 p. m.; she stood at the door of the room; Miss English didn't know her and couldn't talk; remained in her bed until her death and everything had to be done for her; didn't know her pet cats of which she was very fond; on the days following October 5, she just lay there and didn't appear to know anything; Mathews was in charge after the stroke and wanted the employees to cut down on everything.

Paul S. Bischoff, Miss English's pastor testified that: according to his visiting book, he had called on her on October 21, went up to her room, spoke to her, got no response; she gave no evidence of recog-

nizing him; "She was pitifully fragile. Unable to respond to even the greeting which I made"; he offered prayer and left.

Florence B. Hooper, a retired school teacher, had known Miss English for a number of years, once was her neighbor and thereafter regularly visited her once or twice a month. She learned that Miss English had had a stroke on October 5; about two days following the 5th she went to call but was excluded by doctor's orders; she did look into the room and said that Miss English looked as if she were dead; there was no sign of recognition; she did not know her pet kitten which was on the bed; witness and Helen Forney went together to see Miss English on the 10th or 12th of October; her condition appeared to be worse than before; witness had a message she was anxious to deliver to Miss English (the death of a mutual friend) but witness saw that there was no motion, no recognition, she didn't appear to understand or to know what was going on around her.

Helen Forney, a school librarian, had known Miss English for 25 or 30 years, and had seen her once a month for a number of years. She heard of the stroke and went to call the first time on October 9 with Miss Hooper. The nurse didn't want them to go in but they went to the door; Miss English was unconscious or, at least, showed no signs of consciousness or recognition. She made moaning sounds. The nurse gave her a sedative and the visitors left.

Defendant's evidence. Edna Warner, who testified by deposition, was a graduate practical nurse, on duty from October 16 until Miss English's death. She worked from 7 a. m. to 7 p. m. She testified that: Miss English had suffered a paralytic stroke, had a bad heart, suffered heart attacks, her pulse was fluttery, her heartbeat was irregular and fast; on occasions, witness called Dr. Conner because she thought the patient was dying; she saw Miss English sign some checks by making her mark and Mathews would hold her hand to assist; the patient never sat up, did not read, didn't carry on extensive conversations, and did not attempt to run the house.

The witness further said that: she had conversations with Miss English about various flowers; she recalled the different names of iris, sometimes she had to study awhile but would always get the right names; she inquired of witness twice whether Mathews was paying her; she requested the witness to read newspapers to her every day and wanted especially to hear the serial stories; she (the witness) would read the headlines and when her patient heard something which interested her, she would ask that the article be read; sometimes an installment of a serial story would be missing and Miss English wouldn't know the difference; the patient talked on the phone with Mrs. Street and talked a lot about her cats—had names for all of them and could see them by holding them in front of her face; she liked various foods and would make known what she wanted; she ate normally until shortly before her death; she told witness once to call Mathews and ask him to bring her some fish; she didn't like visitors and the doctor ordered them to be kept out; her voice was reasonably good; she was rational; she suffered heart attacks from time to time; she completely trusted Mathews.

Mrs. Lee Ritter, a neighbor, had known Miss English five or six years and had worked for her 1½ years immediately prior to October 11, between 7 p. m. and 7 a. m. She testified that: Lily Davis told her of the stroke; the first night Miss English was in her right mind; witness couldn't see any difference in her mentally before and after the stroke; she asked witness about where her husband worked; asked her to call Mattie Dehoney the morning of the 6th; asked witness to hide a sedative other than that which Dr. Andrews was giving her at the times when Dr. Andrews was coming. Mrs. Ritter said that she worked until October 11, when Clara Davis (apparently a registered nurse who had died shortly before trial) came on duty.

Byrd L. Dunlap, who had lived across the street for 30 years, learned of the stroke an hour or two after it happened. The witness said the stroke occurred in the morning and that she was with Miss English the rest

of the 5th and saw her every other or every few days until her death; after a few days Miss English seemed to get better and seemed to be better for some time; she inquired of witness about Mr. Dunlap on each visit because he had had an illness earlier in the year; she talked about how she felt; witness could see no difference as to the working of her mind; she was able to push her covers away with her hand; she was conscious until her death.

Mary Buseer, who had known Miss English for 30 years and had worked in her garden on Wednesdays for the last three or four years, and had delivered eggs and butter each Saturday, learned of the stroke on Saturday, October 8. Mattie Dehoney told her that the doctor said no one could see Miss English on that Saturday; the next Wednesday she came to work in the garden but Mattie Dehoney and Lily Davis said she was not to work and she didn't see Miss English; the following Saturday, October 15, she saw Miss English after the nurse came downstairs and told her that Miss English wanted to see her; she went up and visited for about an hour; Miss English told her she wanted her to continue to look after the flowers; they talked about covering the roses with straw; Miss English wanted to know if she had been paid for the eggs and butter, inquired about witness' dog, calling the dog by name, and told her to take dog food with her as she had been in the habit of doing; the following Wednesday, Miss English asked the witness to dig some bulbs for the nurse, Miss Warner, and told her which ones. The witness saw Miss English thereafter each Wednesday and Saturday until about the time of her death. Once she told the witness she wouldn't be able to send her the Flower Growers' magazine for Christmas as she had in the past; she talked about the papers she had read; she told witness that Mathews had carried her upstairs at the time of the stroke; talked about witness' brother; urged her not to get home late; before the stroke, the witness was going to buy a radio and Miss English gave her $5 toward it; after the stroke, witness told her about having turned on the radio and how her dogs and cats raised a big fuss, and Miss English got a big laugh out of it; witness could notice no difference in her mind from the time she saw her after the stroke (October 15) as compared to the years before the stroke.

Esther Riepen had lived next door for six years prior to May 1949, and had visited Miss English three times after the stroke but couldn't fix the date of the first visit. Miss English talked about flowers, inquired about the witness' family, seemed to realize that she was quite ill. Witness thought Miss English directed the household after the stroke and could see no change in her condition except that she was weaker.

Eva Mae Frazier had lived next door for four years. She learned of the stroke a few days after it happened and visited twice but couldn't recall the date of the first visit. On her first visit, she heard Miss English inquire who was calling. "I went up and said 'Here is your little boy.'" (Miss English had called the witness that, due to the fact that the first time she saw witness working in the yard, she thought she was a boy.) Miss English called her "Mrs. Frazier" and smiled, but didn't carry on a conversation. She was a very sick woman.

Mrs. Nathan Trotter, a distant relative, saw Miss English in the latter part of November. Witness thought the stroke occurred in the latter part of November. She heard Miss English inquire as to who was calling, and say "Oh, yes, Frances. Have her come up." She talked about her illness and gave the witness the impression that she realized it was her last illness, talked about the witness' son and his recent bride, inquired about witness' husband, and remembered the first name of a mutual friend. She said "she was tired and agreed I should go." The witness said: "Well, now, to me she was the same Cora. She talked just like she used to and—and acted in the same way. I would say she was the same Cora I had known all along."

Returning now to the testimony of Mathews, Mertsheimer, and Street as to Miss English's condition at the time the note and contract were executed. Street

testified that: he, Mertsheimer, and Mathews went to the home on the afternoon of the day the note was prepared; Mertsheimer waited downstairs at Miss English's request; he and Mathews went to the bedroom, submitted the proposal to her, it was agreeable to her, she signed the note by making her mark with his assistance, and instructed him to deliver her stock to Mathews; she signed checks (whether before or after executing the contract does not appear) by making her mark; the money from the note was not put in her account and the arrangement lasted only a day or two. On the 13th, he and Mathews took the contract and stock certificates to the house; when they entered Miss English's room, she was reading a book; he read and explained the contract to her; Lily Davis, the nurse, was there during the entire transaction; Miss English was perfectly normal and appeared to understand the contract; she said: "Do you think this is what I ought to do?", he said: "Yes, I do", and she said: "I am glad to have you say that because that is what I want to do"; he sat on the edge of the bed "and I took my fountain pen and put it in her hand—or rather she took it and I guided her hand and she made her X and the nurse and I witnessed it"; she also signed the two stock certificates in the same way, after he had explained that she was assigning them; after the contract was signed and the stock was delivered to Mathews, Mathews would get the bills and Miss English would okay them and he would pay them; Mathews had, some time ago, indicated to Miss English that he would be interested in buying her stock.

Street testified further that: he, and sometimes Mrs. Street (who did not testify) visited Miss English at later times; he found her in a weak but normal condition; she was interested in her flowers and her 12 or 13 cats; on two occasions she mentioned that Mathews was taking care of her expenses; she had a phone at her bedside and was able to use it during her last illness; he had expected her to live a long time even though 90 or more years of age; he thought $67 per share was a big price for the stock because the Helen English stock had been sold at that price some years before and there had been no substantial change in value except that the company had passed a dividend in 1949. (The company auditor testified that the records showed a dividend was not passed in 1949; that a $3 dividend was declared in December 1949, and paid either then or in 1950.)

Mertsheimer testified that: when he, Mathews and Street arrived with the note she called for him not to come up, stating that she was not presentable to an unmarried man; waiting downstairs, he could hear conversation including her voice, but couldn't distinguish words; she called "goodbye" when the three left; he was never again in her home; Mr. Moran and the other officers and directors of English Brothers knew nothing of the contract until December when, in a meeting in which Mathews was present, witness explained what had been done in so far as Miss English's stock was concerned; "I have always had a criticism of the deal that those people weren't advised"; he didn't know how Mathews handled the money loaned on the note, "but I don't imagine he would give it to Cora. * * * Q. She was not in any shape to transact any business? Was she? A. I wouldn't think so."; as to her condition at the time the contract was signed, "If it would have been my responsibility to sign that I would have taken every precaution to have known her condition at that time"; he did not know at the time that the contract was executed by Cora by an "X mark"; he knew she was in bad shape; he was never satisfied with the deal after it was consummated; he probably made the statement that Anna English (beneficiary of the proceeds of the stock) would sue Mathews on this matter; there was no ready market for the stock; he thought $67 was a very high value; that was the value fixed on the Helen English stock which he thought represented 80 per cent of the value fixed for federal estate tax purposes.

Defendant Mathews testified that: he was called to the home on October 5 and found Miss English on a couch in the living

room; Lily Davis, Mrs. Dunlap, and Dr. Conner were there; when he and Street took the note to be signed, either on the 6th or 7th, Miss English greeted them; he secured the policy of insurance mentioned in the contract and handed it to Street; Mertsheimer suggested the terms of the contract and Street prepared it; he, Mertsheimer, and Street took the contract to the home about 4 p. m. on the 13th; Mertsheimer stayed downstairs; after the contract was signed, he was at the home at least once a day; he paid all the bills and the expenses ran about $800 a month. (Mr. Mathews was not permitted to testify as to the events at the signing of the note, contract and stock certificates.)

■ In reviewing this case, we weigh the evidence and arrive at our own conclusions as to its weight, taking into account the trial chancellor's position to judge the credibility of the witnesses who testified before him. Farr v. Lineberger, Mo.Sup., 207 S.W.2d 455, 459[2–4]. The burden of proof was upon plaintiff to prove by convincing evidence that on October 13 Miss English lacked mental capacity to contract. Huegel v. Kimber, 359 Mo. 938, 943, 224 S.W.2d 959, 962. The question is whether on that day she had sufficient mental capacity to understand the nature and effect of the particular transaction. Vining v. Ramage, 319 Mo. 65, 86, 3 S.W.2d 712, 721 [5, 6]; 17 C.J.S., Contracts, § 133, page 482. Greater mental capacity is required to make a contract when dealing at arm's length and which contract embraces matters requiring mature consideration and reflection, than is required to make a will or gift conveyance. Key v. Kilburn, Mo.Sup., 228 S.W.2d 731, 737[3–7]; Huegel v. Kimber, supra, 224 S.W.2d at page 960[1].

Plaintiff's petition sought cancellation of the contract and stock assignments on three grounds: mental incapacity, undue influence, and inadequacy of consideration. The trial chancellor made no specific findings of fact, but, as noted, found the issues for plaintiff and against the defendant, and held the contract and assignments void.

If the testimony of Dr. Andrews and Lily Davis as to the mental condition of Miss English on the day of and at the very time of the execution of the documents is true, then clearly and without doubt she did not have sufficient mental capacity to understand the particular transaction or, for that matter, sufficient mental capacity to understand anything. She was wholly without understanding. Irreconcilably contrary testimony as to Cora's mental condition at the very time of the execution of the contract was adduced by defendant through Messrs. Mathews, Mertsheimer, and Street. If their testimony, particularly the conclusion of Mr. Street that Cora was perfectly normal mentally, is true, then certainly Miss English was not wholly without understanding, even though a question would remain as to whether she had sufficient mental capacity to understand the nature and effect of the particular transaction. As Street testified by deposition, the trial chancellor did not have the opportunity to see or hear him. However, the trial chancellor who did see and hear the other witnesses (except Edna Warner, who also testified by deposition), concluded that plaintiff's evidence on the issue of mental capacity outweighed defendant's.

■ We have endeavored to analyze and weigh the evidence. We are convinced that the trial chancellor reached the correct conclusion. Our study has developed no cause for disbelief of Dr. Andrews' testimony. She had no apparent interest in the controversy. While her itemized statement did not reflect charges for calls she said she made on October 10 and 12, that she was in attendance on the 12th seems well corroborated by the demerol prescription she wrote on that date. She was there on the 13th, the day of the signing of the documents. True, also, it is that Dr. Andrews wrote on the death certificate that the cerebral hemorrhage had occurred three days prior to December 23; she said she meant to write approximately three months. But there seems to be no real question but that Miss English did in fact suffer a hemorrhage on October 5 and that the site of the

hemorrhage was the brain. We cannot escape the conclusion that great weight must be attributed to the testimony of the doctor who had attended Miss English for 25 years.

Furthermore, when we view the broad picture in the light of the sequence of events as described by defendant's witnesses, we are struck by some significant facts which seem to us not consonant with a finding of sufficient mental capacity in Miss English to have understood the nature of the transaction. Here, a woman past 90, in admittedly deplorable physical condition, suffered a cerebral hemorrhage on October 5. Three men, including her personal attorney, sought to make arrangements for her financial security. Lofty as their motives were, their choice of an arrangement and the manner in which it was consummated, were, at least, unfortunate. Two of them were without information as to the true condition of Miss English or the nature of her illness (Mr. Street thought she had sustained only a crippling fall, he did not discuss her condition with any doctor although he knew that Dr. Andrews had been in constant attendance; Mertsheimer understood she had a blood clot but didn't know what that meant, he didn't inform himself very thoroughly about her condition). Nevertheless, the three proceeded with immediate arrangements for her to sign a note. Significant is the fact that all her stock was to secure that relatively small loan. No collateral loan agreement was prepared, and there was no evidence of the terms and conditions of any oral security agreement. The stock was simply to be delivered to Mathews as security. No money was to be or was transferred to her account, and defendant was to pay the bills. At the time the note was signed, Mertsheimer, even with his limited knowledge of her condition, didn't think that she was in any shape to transact business. On the day after the signing of the note, and because of inaccurate information supplied by Mathews (to the effect that most of the $2,000 had by then been spent, when not to exceed $187.50 had been spent), new arrangements were made. Significant is the fact that no arrangement was seriously considered other than one whereby Mathews was to acquire all the stock. Significant also is the fact that no contention is made that Street, Miss English's attorney, or any one else discussed with her the nature and effect of either the note or contract transaction, save and except at the very times of the signing of the instruments. No private, independent conference occurred between attorney and client. Here was a contract prepared without prior consultation with the party it primarily affected; it covered a very important matter; it involved a business transaction; it embraced a step by Miss English that at the very least required detailed explanation to her and mature consideration on her part, even if she had been well physically and mentally. It should be noted also that she had by her will evidenced no desire that defendant have all the stock. Significant also is the ambiguity of the contract terms. Both parties on this appeal have construed the contract to mean that Mathews was obligated to pay for the stock only the amount actually expended for Cora's expenses during the remainder of her life. (In the trial court defendant took the position that by the terms of the contract he owed the estate the difference between the amount he had expended, $2,909.60, and $24,857. On this appeal, however, defendant says: "Although not obligated, because Miss English died before expected, and the expenses were correspondingly lighter, appellant offered to pay the estate of Cora L. English the difference between the $24,857, fixed as value of the stock by the contract, and the $2,909.60 he expended, as a pure gratuity to show his complete fairness and good faith in the matter.") Clearly, however, whatever else the contract may mean, defendant was to pay at least $24,857 for the stock. Whether in addition he was to furnish money for expenses or whether the expenses were to be paid out of the $24,857 is somewhat questionable. In any event, however, the fact remains that the contract, as drawn, was not so clear as to make its terms easily explainable or understandable by even one in excellent mental condition.

Significant also is what appears to have been unseemly haste and anxiety to accomplish an arrangement and then a substitute arrangement, whereby the living expenses of a fatally ill woman, past 90, for the obviously relatively short remainder of her life, were to be provided. And whatever else may be said of the method chosen, the fact remains that one of its features was that defendant was to end up with the stock; a result in which he was vitally interested.

Defendant lays great stress upon the fact that Street was the personal attorney for Miss English and that she therefore had independent advice as to her contract with one who was in her trust and confidence. Of course, if the testimony of Dr. Andrews is true, this argument begs the question. For certainly, if Miss English was wholly without understanding and mental capacity, she couldn't receive and understand advice from any one. But in any event, as we have noted, no attempt was made to give Miss English any really independent advice. Street's conclusion, conveyed to Cora, that she ought to execute the contract at the very moment it was first presented to her, did not constitute independent advice and counsel.

█ We have examined the many authorities cited which announce the applicable rules of law and which apply those rules to varying factual situations presented in those cases. The evidence in this case is not "all one way". We have noted and considered that Lily Davis witnessed the mark of Miss English. Defendant argues that by so doing, Lily Davis in effect declared that Miss English had mental capacity at the time to understand the transaction in which she was engaged and that Lily Davis' testimony to the contrary is entitled to little, if any, weight. We do not think such a conclusion follows. True, it has been held that the testimony of a subscribing witness to a will that the testator was of unsound mind at the time he executed the will is entitled to little weight. Southworth v. Southworth, 173 Mo. 59, 74, 73 S.W. 129, 133. Whether such an arbitrary rule is fundamentally sound may be debatable. (See Comment of Annotator, 79 A.L.R. 404.) But in any event that rule would not apply, with equal force at least, where, as here, the witness testified that she witnessed only the fact that a mark was placed upon a document under the circumstances she described.

After careful consideration of the whole record, we conclude that the judgment should be modified to include any dividends received by defendant from the stock between the date of the original decree and the date when final judgment is entered, and, as so modified, the judgment of the trial chancellor should be and is affirmed on the ground that Cora English did not, on October 13, 1949, have sufficient mental capacity to execute the purported contract and assignments. Farr v. Lineberger, supra, 207 S.W.2d 455; Anast v. Czerwenka, 356 Mo. 741, 203 S.W.2d 463; Vining v. Ramage, supra, 3 S.W.2d 712.

The cause is remanded with directions to enter judgment as indicated.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.