

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

ANTHONY E. BARRON, )
)
Respondent, )
)
v. ) WD87250
)
MARTHA PARKER, INDIVIDUALLY ) Opinion filed:  September 9, 2025
AND AS REPRESENTATIVE OF THE )
ESTATE OF CATHERINE L. )
BRIZENDINE (DECEASED), )
)
Appellant. )

**APPEAL FROM THE CIRCUIT COURT OF
LIVINGSTON COUNTY, MISSOURI
THE HONORABLE RYAN W. HORSMAN, JUDGE**

Before Division Two:  Lisa White Hardwick, Presiding Judge,
Edward R. Ardini, Jr. , Judge and W. Douglas Thomson, Judge

Martha Parker ("Daughter")[1] appeals the trial court's judgment in favor of

Anthony E. Barron ("Buyer"), ordering Catherine Brizendine ("Owner") to

specifically perform the contract between Owner and Buyer ("Contract").

---

[1] In the underlying litigation, Catherine Brizendine appeared by her daughter, Martha Parker, acting as her Guardian ad Litem.  On June 6, 2025, following the death of Catherine Brizendine, Martha Parker filed a motion to be substituted as the appellant in this action.  On June 16, 2025, this Court sustained Parker's motion, ordering that Martha Parker be substituted "individually and in her representative capacity as personal representative for Appellant Catherine L. Brizendine (deceased)[.]"

Daughter raises four points on appeal. In her first two points, Daughter argues the trial court erred because its finding that Owner had capacity to enter the Contract was not supported by substantial evidence (Point I) and was against the weight of the evidence (Point II). In her third Point, Daughter claims the trial court erred in failing to find undue influence because that finding was against the weight of the evidence. Finally, Daughter argues the trial court erred in abrogating Owner's right to a jury trial. Finding no error, we affirm.

## Factual and Procedural Background[2]

In 2007, Buyer met Owner's brother. Owner's brother explained that he was getting older and no longer able to farm his family's ground. Buyer made an agreement with Owner, her sister, and her brother to farm for them. Buyer continued farming for Owner, even after her siblings passed and their respective farms sold. Buyer and Owner had a verbal agreement where Buyer would farm Owner's 80-acre farm, and Owner would get a third of the profits from the crops harvested. During this time, Daughter resided in Colorado.

Over the course of the approximately 18 years Buyer farmed for Owner, "she just kinda became a good friend" to Buyer. Buyer would watch over Owner when weather was bad, mow her lawn, and occasionally picked up her medicine when

---

[2] "On appellate review of a court tried case, the evidence is viewed 'in the light most favorable to the circuit court's judgment and defer[s] to the circuit court's credibility determinations.'" *ROH Farms, LLC v. Cook*, 572 S.W.3d 121, 123 n.2 (Mo. App. W.D. 2019) (quoting *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014)).

2

she was unable to get out. The two would sometimes spend holidays together, including when Owner once brought Buyer food for Thanksgiving.

In recent years, Owner and Buyer began having long visits. Owner would talk about how proud she was of her independence and her ability to make a living over the course of her life. Owner would also tell Buyer about past issues with Daughter, describing that she often had trouble trusting Daughter.

In 2016 or 2017, Owner asked Buyer if he wanted to buy her farm. Buyer explained that he could not afford to pay what she could get for the farm at auction. Owner shared that she thought that she would rather sell the farm to Buyer than take it to auction, but she was not ready to leave home yet.

In July of 2021, Buyer met his current girlfriend ("Girlfriend") while farming at Owner's. Girlfriend also met Owner at that time, developing her own relationship with Owner. By June of 2022, the occasional conversations about Buyer purchasing Owner's farm became more serious. The two discussed what a fair price would be, and they agreed that Owner would sell the farm to Buyer for $200,000. Buyer drafted the Contract with the help of a friend who had recently participated in a property sale, but he decided to wait for Daughter "to be around" before the Contract was signed so that "it would be in the open." At that time, Girlfriend was also assisting with Owner's care. Girlfriend observed that Owner "was very trustworthy [sic] in [Buyer], that they had a very good relationship, and that [Owner] confided in [Buyer] about a lot of things[.]"

On August 2, 2022, a bookcase fell on Owner and she was taken to the hospital. While Owner was recovering in a rehabilitation facility, Girlfriend and Buyer visited her. After being treated for her injuries and recovering in the rehabilitation facility for about a month, Owner returned home. At that time, Owner and Daughter began making plans for Owner to move to Daughter's Colorado home.

On September 9, 2022, Daughter called Buyer and told him that Owner asked that he come to her house. Daughter also told Buyer that Owner wanted him to bring the Contract because Owner and Daughter were scheduled to leave for Colorado the next day. Owner realized that she would not be returning for some time and knew that if an agreement could be made with Buyer, it needed to be signed before she left.

Buyer and Girlfriend arrived at Owner's house around 7:00 PM and began visiting with Owner and Daughter. Eventually, Owner brought up the Contract. Owner asked Daughter and Girlfriend to go outside and visit so that Owner and Buyer could discuss the transaction. The two went outside but periodically came back into the house to check on things with Owner and Buyer. On one of these check-ins, Daughter looked at Owner and said, "Momma, just go on and sign. Start a new life in Colorado." After this, Owner signed the Contract.

When Buyer left for the evening, Daughter acknowledged the sales price by confirming that Buyer gave Owner "two" for the farm. When Buyer confirmed, Daughter told him that he was a good man. Daughter also wrote in her daily

journal that "[Buyer] and [Owner] agreed – agreement on selling farm." The following morning, Buyer and Girlfriend returned to Owner's home to help load Owner's items into Daughter's car, and Owner departed for Colorado with Daughter. That same day, Buyer met with a loan officer to secure financing for his purchase of Owner's farm.

On September 18 and 19, 2022, Daughter received a text message from Owner's neighbor containing an offer to purchase Owner's farm for $250,000 more than Buyer agreed to pay in the Contract. Ten days later, Daughter informed Buyer that she was "stopping" the Contract. Buyer attempted to change Daughter's mind, requesting that Owner honor the Contract, to no avail. Accordingly, the farm did not sell pursuant to the Contract, and Buyer filed this lawsuit.

Initially, Buyer raised a claim for specific performance and a claim for breach of contract. Owner, through Daughter as her guardian ad litem, filed a responsive pleading which included affirmative defenses of undue influence and lack of capacity to contract. Owner requested that the matter be tried to a jury, and Buyer asserted his opposition to that request to the extent that it related to his equitable claim for specific performance. In addressing the competing positions of the parties, the trial court entered its scheduling order which indicated that the matter would be tried to a jury. On February 5, 2024, during a pretrial conference, Buyer orally dismissed his claim for breach of contract, intending to proceed to trial "on specific performance alone." At that time, Owner's counsel argued that there were "still factual issues which I think need to be resolved by a jury." The

5

trial court took the matter under advisement, and on February 9, 2024, reset the matter for a bench trial because "the remaining specific performance claim lies in equity."

The bench trial began on March 28, 2024. Buyer testified regarding the Contract and his relationship with Owner. Buyer also offered the testimony of the loan officer who assisted him in securing financing for the purchase of Owner's farm and the testimony of Girlfriend regarding her perspective on the events that took place. Daughter testified in opposition, taking the position that Owner lacked capacity to enter the Contract. Daughter offered the testimony of a neuropsychologist and an appraiser. The neuropsychologist was not Owner's doctor until she moved to Colorado. He testified that he reviewed Owner's medical records, all from before the Contract was signed. The neuropsychologist testified that, in his opinion, Owner was not competent to sign the Contract on September 9, 2022, based on his retrospective analysis of medical records which pre-dated the Contract. Next, the real estate appraiser testified to the value of Owner's farm, which was substantially higher than the Contract price.

On April 24, 2024, the trial court entered its judgment, finding "in favor of [Buyer] and against [Owner] on [Buyer's] Petition for Specific Performance." The trial court ordered "[Owner] to specifically perform the Contract and deed the real estate [(the farm)] to [Buyer] within 45 days of this Judgment." This appeal follows.

## Analysis

Daughter raises four points on appeal. In her first two points, Daughter argues the trial court erred because its finding that Owner had capacity to enter the Contract was not supported by substantial evidence (Point I) and was against the weight of the evidence (Point II). In her third point, Daughter argues the trial court erred in not finding that Owner was under the undue influence of Buyer at the time of executing the Contract because that finding was against the weight of the evidence. In her fourth point, Daughter argues the trial court erred in its decision "to abrogate" Owner's right to a jury trial.

Daughter's first three points challenge the trial court's discretion to award the equitable remedy of specific performance. "'Specific performance is purely an equitable remedy and must be governed by equitable principles.'" *Bhoot v. 701-709 NE Woods Chapel Road, LLC*, 704 S.W.3d 710, 724 (Mo. App. W.D. 2024) (quoting *Brown v. Smith*, 601 S.W.3d 554, 559 (Mo. App. W.D. 2020)). It is not awarded as a matter of right, but rather it is a remedy that is "applied by courts of equity, depending upon the facts in the particular case[.]" *Smith v. Najafi*, 584 S.W.3d 389, 394 (Mo. App. W.D. 2019) (quoting *ROH Farms, LLC v. Cook*, 572 S.W.3d 121, 125 (Mo. App. W.D. 2019)). "[T]he trial court has judicial discretion within the established doctrines and principles of equity to award or withhold [specific performance]." *Id.* (quoting *ROH Farms, LLC*, 572 S.W.3d at 125 (internal quotation marks omitted)). Courts award specific performance "so that 'justice may be done between the parties'" and not "'where it will result in

7

injustice.'" *Bhoot*, 704 S.W.3d at 724 (quoting *Kopp v. Franks*, 792 S.W.2d 413, 419 (Mo. App. S.D. 1990)). "A trial court 'is afforded much discretion' in determining whether specific performance is an appropriate remedy for breach of contract." *Id.* (quoting *McBee v. Gustaaf Vandecnocke Revocable Tr.*, 986 S.W.2d 170, 173 (Mo. banc 1999)).

The availability of specific performance for Owner's breach of the Contract was determined during a bench trial. "We review all court-tried cases using the standard articulated by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)." *Bhoot*, 704 S.W.3d at 724. "We will affirm the trial court's judgment 'unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.'" *Id.* (quoting *Murphy*, 536 S.W.2d at 32). "In resolving points on appeal that challenge the factual determinations by the trial court, we view the evidence . . . in the light most favorable to the trial court's judgment and defer to any credibility determinations made by the trial court." *Id.* (citing *Coleman v. Hartman*, 626 S.W.3d 289, 295 (Mo. App. W.D. 2021)). "Further, [w]e will affirm the trial court's judgment . . . on any basis supported by the record." *Pentecost v. Webster*, 674 S.W.3d 195, 204 (Mo. App. S.D. 2023) (internal quotation marks and citation omitted) (alterations in original).[3]

---

[3] While Daughter's first three points on appeal purport to challenge specific findings by the trial court, the trial court did not issue a detailed statement of grounds for its decision and did not issue specific findings of fact. Rather, the trial court merely found "in favor of [Buyer] and against [Owner] on [Buyer's] Petition for Specific Performance." Notably, no party requested that the trial court make specific findings of fact pursuant to

"Under the common law, a contract is deemed void if a party lacks the requisite mental capacity at the time of contracting . . . ." *Netherton v. Netherton*, 593 S.W.3d 654, 665 (Mo. App. W.D. 2019) (quoting *Ivie v. Smith*, 439 S.W.3d 189, 204 (Mo. banc 2014)). "Applying these contract principles [here], the party requesting the enforcement of the [contract] has the burden of establishing, by clear and convincing evidence, that the person who [entered into the contract] had the contractual capacity to do so." *Id.* In order to have contractual capacity, a contracting party must have "sufficient mental capacity to understand the nature and effect of the particular transaction." *McElroy v. Mathews*, 263 S.W.2d 1, 10 (Mo. 1953).

In her first point, Daughter argues that the trial court erred in "entering judgment finding that [Owner] had the capacity to make a contract because that finding was not supported by substantial evidence." Specifically, Daughter claims the "uncontroverted and independent medical evidence showed the 91-year-old [Owner] suffered from dementia, memory loss, and hallucinations and no evidence was submitted to support the contention she had the capacity to contract on the night the contract was signed."

---

Rule 73.01(c). Rule 73.01(c)'s final paragraph provides: "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Consequently, because the trial court granted Buyer's petition for specific performance, <u>all</u> fact issues in the case are considered as having been found in Buyer's favor. *See* Rule 73.01(c). And, as discussed, we will affirm the trial court's grant of specific performance on any basis supported by the facts in the record.

A not-supported-by-substantial-evidence challenge requires completion of certain steps:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,
>
> (3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010).

"[A]dherence to this analytical formula is mandatory not just because this Court says so, but because it reflects the underlying criteria necessary for a successful challenge—the absence of any such criteria, even without a court-formulated sequence, dooms an appellant's challenge." *Nichols v. Belleview R-III School District*, 528 S.W.3d 918, 928 (Mo. App. S.D. 2017). In Point I, Daughter asserts there is no favorable evidence to support the proposition that Owner had capacity to enter the Contract. Our review of the record finds sufficient evidence by which the trial court could find Owner had the contractual capacity to enter into the Contract, and it was therefore proper for it to render the judgment before us.

First, we note the trial court's judgment did not expressly address Owner's capacity to enter the Contract. However, in rendering judgment for specific performance of the Contract, the trial court necessarily rejected Daughter's assertion that Owner did not have the capacity to contract. *See* Rule 73.01(c) ("All fact issues upon which no specific findings are made shall be considered as having

10

been found in accordance with the result reached."). And, such finding was reasonable in that, when viewing the evidence in the light most favorable to the trial court's judgment, it sufficiently induces belief that Owner had capacity to enter the Contract at the time it was entered.

The evidence adduced by Buyer demonstrated that Owner understood "the nature and effect" of entering the Contract at the time it was signed. Both Daughter and Buyer testified that on the evening the Contract was signed, Owner initiated the process by asking Daughter to invite Buyer to her home. Owner specifically asked Daughter to tell Buyer to bring the Contract with him. Daughter complied, calling Buyer *at Owner's request* for the specific purpose of entering into an agreement to sell her farm to Buyer. It was Owner's idea to sign the Contract on that evening. In fact, the Contract was signed on the eve of Owner's move to Colorado, a time which Owner considered her "last chance" to sign the Contract before she moved.

The trial court also heard evidence that approximately one month prior to executing the Contract, at a time when Owner's neuropsychologist witness testified Owner was incompetent, Owner executed another legal document. While at the rehabilitation facility following her fall, Owner signed a durable power of attorney naming Daughter as her attorney in fact for certain purposes. The trial court heard that Owner's signature was notarized without complication, and that Daughter witnessed the execution of the power of attorney by Owner. Daughter testified this power of attorney benefitted her. Notably, the trial court also heard that, though

11

Daughter's cited medical evidence now asserts Owner was incompetent at the time of such document's execution, neither Daughter nor the notary public questioned Owner's capacity to execute *this* legal document.

Further, no evidence was presented as to any expression of concern by Daughter regarding Owner's capacity at the time the Contract was executed. Rather, the trial court heard evidence regarding Daughter's encouragement and active role in the execution of the Contract. This most certainly influenced the trial court's equitable considerations. Indeed, at the close of the parties' evidence, the trial court opined as to Daughter's involvement, stating:

> [A]fter a couple of hours, the testimony is that [Owner and Buyer] were in there. They obviously discussed it and the contract was signed. And then after that . . . the daughter, then said, ["]Go ahead and sign it. Let's start your new life in Colorado.["]
>
> That's a difficult fact for me . . . And even if I find that [Owner] didn't have the capacity to sign that herself, is that not the assent of the [Daughter] saying, ["]Sign that contract, Sell him that land, and let's go start anew?["]

Our review of the evidence is consistent with the trial court's observations. As discussed above, both Daughter's and Buyer's testimony demonstrated that it was Daughter who made the phone call to Buyer on the evening the Contract was signed. And, during that phone call, Daughter specifically informed Buyer that Owner requested he bring the Contract over to Owner's house. There was also uncontroverted evidence that while Buyer was at Owner's house, Daughter left him alone inside with Owner and the Contract without concern. Even after the Contract was signed, Daughter verified the sale price with Buyer to ensure that Owner

12

received "two" for the farm. Buyer assured Daughter that Owner received such amount, and Daughter complimented him, calling him a "good man." Daughter did not provide any evidence that she possessed or expressed concern about Owner's mental state at any point on the evening the Contract was signed. And, as the trial court observed, Daughter even testified that before Owner signed the Contract, she encouraged the signing, stating, "Momma, just go on and sign. Start a new life in Colorado."

Daughter's journal entry from the date the Contract was signed was also offered into evidence. Daughter wrote, "[Buyer] and mother [(Owner)] agreed – agreement on selling farm[.]" Absent from the journal entry was any concern regarding Owner's capacity. This evidence made Daughter's complaints regarding Owner's capacity to enter the Contract even more curious, and the trial court was free to interpret that evidence as detrimental to Daughter's credibility as a witness.

Even more detrimental to Daughter's argument is the evidence that just 10 days after the Contract was signed, Daughter received a text message from a neighbor who offered to purchase the farm for $250,000 more than the Contract price. Daughter responded to the offer, texting, "When the time comes, we'll talk[.]" When asked what she meant by that, Daughter testified that she meant, "When my mom passes away, we'll talk." It was after this, on September 29, 2022, that Daughter told Buyer she was "stopping" the Contract.

The trial court could reasonably discount the circumstantial evidence Daughter offered in her attempt to prove that Owner lacked capacity *at the time*

13

the Contract was signed. This evidence included the testimony of a neuropsychologist concerning his retrospective analysis of Owner's medical records. The neuropsychologist did not interview Owner until February 26, 2024, nearly 18 months after the execution of the Contract. Further, while Daughter directs us to instances in Owner's medical records where she claims the trial court could have inferred that Owner lacked capacity to contract, these records are merely snapshots in time and do not represent Owner's capacity at the time of signing the Contract.

The trial court reasonably determined that Daughter's concerns regarding Owner's mental state were unfounded, and her claim arose only after she received an offer for the farm that was significantly larger than the Contract price. The cited evidence regarding Daughter's failure to raise concerns about Owner's capacity at any point prior to the Contract being signed, on the evening the Contract was signed, or for the nearly three weeks after the Contract was signed until after she received a higher offer for the land supports the trial court's finding that her capacity claim was dubious.

Sitting in equity, the trial court not only considered the evidence that directly related to Owner's capacity to enter the Contract, but it also considered fundamental principles of equity and justice. *See Bhoot*, 704 S.W.3d at 724. The trial court had sufficient evidence to find that Owner had capacity to enter the Contract. Accordingly, Points I is denied.

14

In her second point, Daughter argues that the trial court's finding "that [Owner] was competent to make a contract" was "against the weight of the evidence[.]" Specifically, Daughter claims "that the uncontroverted and independent medical evidence showed that [Owner] suffered from dementia, memory loss and hallucinations" and that "[Buyer's] evidence will not support the contention [Owner] had the capacity to contract on the night the contract was signed."

> [A]n against-the-weight-of-the-evidence challenge requires completion of four sequential steps:
>
> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;
>
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
>
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston*, 317 S.W.3d at 187. "A court will set aside a judgment as 'against the weight of the evidence' only when it has a 'firm belief that the judgment is wrong.'" *Id.* at 186 (quoting *Gifford v. Geosling*, 951 S.W.2d 641, 643 (Mo. App. W.D. 1997)).

"[W]eight of the evidence refers to weight in probative value, not quantity or the amount of evidence. The weight of evidence is not determined by mathematics,

15

but on its effect in inducing belief." *Bell-Kaplan v. Schwarze*, 712 S.W.3d 836, 845–46 (Mo. App. S.D. 2025) (quoting *Houston*, 317 S.W.3d at 186). "An against-the-weight-of-the-evidence challenge is not an opportunity for an appellant to receive a new factual determination from a different court." *Id.* at 846 (quoting *Int. of E.M.F.*, 671 S.W.3d 866, 870 (Mo. App. S.D. 2023)) (internal quotation marks omitted).

In Point II, Daughter aptly asserts that the challenged factual proposition is "[Owner's] mental capacity when the contract was signed." In the second step of her challenge, Daughter asserts that "[Owner] produced no evidence" supporting Owner's capacity. Thus, Daughter fails to acknowledge *any* favorable evidence of Owner's capacity. This is contrary to an against the weight of the evidence claim, which "presupposes that there is sufficient evidence to support the judgment." *Ivie*, 439 S.W.3d at 205 (citation omitted). "Having failed to satisfy this second analytical step, the [Appellants] consequently 'doom their ability to satisfy the last step of [the] challenge.'" *Riead, Co-Trustee of John T. Riead, Jr. Revocable Trust v. Riead III, Co-Trustee of John T. Riead, Jr. Revocable Trust*, 685 S.W.3d 532, 546 (Mo. App. W.D. 2023) (quoting *Houston*, 317 S.W.3d at 188) (alteration in original).

Daughter's contention, that there is *no* evidence in the record to support the challenged factual proposition, necessarily indicates that Daughter is not asking this Court to *weigh* any evidence, as a matter of law. Rather, by arguing that there is no evidence to support the fact that Owner had capacity to enter the Contract,

16

the only permissible argument for Daughter to make is a substantial evidence challenge. *See Ivie*, 439 S.W.3d at 205–06 (holding that an against-the-weight-of-the-evidence challenge contemplates *weighing competing* evidence and "presupposes that there is sufficient evidence to support the judgment"). Thus, Daughter's second point on appeal must fail. Accordingly, Point II is denied.

In her third point on appeal, Daughter claims the trial court erred "in entering judgment finding that [Owner] did not execute the [C]ontract under undue influence because that finding was against the weight of the evidence[.]" As discussed in our analysis of Point II, *supra*, "weight of the evidence refers to weight in probative value, not quantity or the amount of evidence. The weight of evidence is not determined by mathematics, but on its effect in inducing belief." *Bell-Kaplan*, 712 S.W.3d at 845–46 (quoting *Houston*, 317 S.W.3d at 186).

"Undue influence occurs when a party in a position of trust induces the other, by active conduct, to provide a substantial benefit through the transfer of property." *Wilson v. Trusley*, 624 S.W.3d 385, 400 (Mo. App. W.D. 2021) (quoting *Nestel v. Rohach*, 529 S.W.3d 841, 845 (Mo. App. W.D. 2017)) (internal quotation marks omitted). "Undue influence itself is usually defined as such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *Id*. (citation omitted). "A finding of undue influence cannot rest upon speculation and conjecture. Motive and opportunity alone are not enough." *Id*. at 400–01 (quoting *Sweeney v. Eaton*, 486 S.W.2d 453, 456 (Mo. 1972)).

"Undue influence is presumed when the following elements exist: '(1) the existence of a confidential or fiduciary relationship between the settlor and the beneficiary, (2) the beneficiary is given a substantial benefit, and (3) the beneficiary was active in procuring execution of the document conferring the benefit.'" *Id.* at 400 (quoting *Cima v. Rhoades*, 416 S.W.3d 320, 324 (Mo. App. E.D. 2013)). This presumption of undue influence "operates to create a submissible question for the jurors" in a jury-tried case, and upon plaintiff establishing such presumption the burden shifts to the defendant to rebut same. *See id.*

This, however, was a court-tried case. The court "need not specifically evaluate whether the contestant met the elements giving rise to a presumption of undue influence, but rather must only determine the ultimate question of fact: whether the [contract executed] was the result of undue influence that deprived [Owner of] her free agency." *Id.* (quoting *Cima*, 416 S.W.3d at 324). We proceed accordingly.

As previously stated, the trial court here did not explicitly render findings. It is evident based upon the trial court's judgment requiring specific performance of the Contract, however, that undue influence was not found. *See* Rule 73.01(c).

The evidence adduced at trial established that Owner and Buyer developed a friendship over the years he farmed her land, and this often led to long talks about a wide spectrum of topics. Buyer assisted Owner with tasks like mowing the lawn, picking up groceries, and getting the mail. On occasion, the two even shared

18

holidays together. And, Buyer assisted Owner *and* Daughter in the final packing when Owner moved to Daughter's Colorado home. Though these occasions may have provided Buyer opportunity to discuss the land sale with Owner, there was no direct evidence suggesting these opportunities included *any* "overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *Id.* (citation omitted). It is nothing more than speculation to consider otherwise. Further, it was Owner who initiated the discussions about selling her farm to Buyer. Owner continuously brought up the potential over the years, and Owner ultimately initiated the signing of the Contract itself.

Moreover, Buyer was consistently transparent with Owner about what he could afford in comparison to what the farm was actually worth. Buyer was plain-spoken with Owner that what he could financially afford was less than the true value of the real estate. Then, Buyer testified that he waited to sign the Contract with Owner until Daughter returned from Colorado because he wanted things to remain in the open. The trial court opined at the close of evidence:

> [T]he undue influence, or I think the argument that [Buyer] was untoward is a little bit difficult to buy in the fact that he lived a mile down the road and he could have done that at any time when [Daughter] was in Colorado a thousand miles away. So I think that kind of mitigates against the fact that he is going under the table.

Further, we are mindful of Daughter's active participation, lack of any stated misgivings, and her statements of affirmation on the evening the Contract was signed, all as previously described. In sum, there is no indication that Buyer

19

obtained Owner's signature on the Contract through the coercion or force necessary to demonstrate undue influence.

Daughter argues "[Buyer] agreed [Owner] trusted [Buyer] and was dependent upon [Buyer] for her basic needs, [Buyer] admitted he benefitted from the below market value transaction, [Buyer] admits the transaction represents a change in [Owner's] estate planning, and [Buyer] further admitted he discouraged [Owner] from seeking other advice about the transaction." Here, Daughter relies on favorable inferences that we are not required to make. Rather, under our standard of review, there was not any evidence presented that suggested, let alone established, that Buyer abused his position of trust with Owner to entice her to sign the Contract. Further, the trial court was required to answer only the overall question—was the contract executed as the result of undue influence which deprived Owner of her free agency. Daughter's argument represents a rigid approach to analyzing only the *presumption* of undue influence without addressing the evidence presented rebutting the same. Point III is denied.

In Daughter's fourth point on appeal, she argues the trial court erred in abrogating Owner's right to a jury trial. Specifically, Daughter contends that "although labeled an action for specific performance, the case at trial presented mixed issues of equitable relief, legal relief, and legal defenses in that [Buyer's] claim for consequential damages and the assertion of a lack of contractual capacity are issues of fact for a jury to determine." We disagree.

"The Missouri Constitution provides that the right of trial by jury as heretofore enjoyed shall remain inviolate." *State ex rel. Barker v. Tobben*, 311 S.W.3d 798, 800 (Mo. banc 2010) (internal quotation marks and citation omitted). In civil cases, however, "the right to trial by jury attaches only to actions at law for which damages may be awarded, not to suits in equity." *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 352 (Mo. banc 2006). Ultimately, "[t]he trial court has discretion to try such cases in the most practical and efficient manner possible, consistent with Missouri's historical preference for a litigant's ability to have a jury trial of claims at law." *State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462, 473 (Mo. banc 2004).

"[S]pecific performance of a contract is a wholly equitable remedy governed by equitable principles." *Collins v. Jenkins*, 821 S.W.2d 892, 894 (Mo. App. S.D. 1992) (citing *Hoover v. Wright*, 202 S.W.2d 83, 86 (Mo. 1947)). "The equitable remedy of specific performance is not a matter of right but is a remedy applied by courts of equity, depending upon the facts in the particular case; and the trial court has judicial discretion within the established doctrines and principles of equity to award or withhold the remedy." *Najafi*, 584 S.W.3d at 394 (quoting *ROH Farms, LLC*, 572 S.W.3d at 125).

In the present case, prior to trial Buyer dismissed his claim for breach of contract against Owner. This left pending Buyer's sole remaining claim for specific performance of the Contract, a claim for an equitable remedy to be applied by a court of equity. Thus, the trial court, vested with the discretion to determine

21

whether matters of equity or law were then before it, determined that a bench trial was the most practical and efficient way to try Buyer's claims. Because the only claim pending before the trial court was Buyer's equitable claim for specific performance, the trial court was within its discretion to proceed with a bench trial.

Daughter's argument rests on her claims of lack of capacity and undue influence discussed in Points II and III, *supra*, that were asserted as affirmative defenses to Buyer's claims. These compose her assertion "that mixed issues of equitable relief, legal relief, and legal defenses" require a jury trial. However, Daughter does not direct us to any case where this Court has held that an affirmative defense involving contract law matters is sufficient to dissolve a trial court's equitable jurisdiction, nor do we find such a case in our research.

On the contrary, it is evident that claims for specific performance usually, and necessarily, contain some allegation of breach of contract. And, Missouri courts have consistently affirmed the grant and/or denial of specific performance after a bench trial, even when underlying contract law issues exist. *See, e.g.*, *ROH Farms, LLC*, 572 S.W.3d at 121, 125 (bench trial on plaintiff's claim for specific performance involving arguments that plaintiff anticipatorily breached the contract by repudiation and the defendants detrimentally relied on that breach in failing to perform); *Brown v. Smith*, 601 S.W.3d 554, 557 (Mo. App. W.D. 2020) (bench trial on claim for specific performance when the underlying issue was whether the contract lacked consideration); *Barkho v. Ready*, 523 S.W.3d 37, 42

(Mo. App. W.D. 2017) (bench trial on claim for specific performance when the issue was whether there was a meeting of the minds).

The trial court did not err in denying Owner's request for a trial by jury. Point IV is denied.

## Conclusion

For the above and foregoing reasons, the judgment of the trial court is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.